**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CENTER FOR LEADERSHIP AND JUSTICE, for itself; SHAWANDA BREEDLOVE, TRINITY CLAUDIO, CYVONNE COOK, TAMMY DAVIS, YULISSA ESPINAL, STEPHANIE GRANT, MARINA ILARRAZA, ASHLEY MATOS, MIRNA MEDINA, MILAGROS ORTIZ, MARITZA ROSARIO and NETZABILIE TORRES, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. 3:20-cv-1728-MPS |
| PLAINTIFFS, | ) ) ) | **JURY DEMANDED** |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; MARCIA L. FUDGE, in her official capacity as Secretary of United States Department of Housing and Urban Development; HOUSING AUTHORITY OF THE CITY OF HARTFORD; THE CITY OF HARTFORD, d/b/a THE CITY OF HARTFORD HOUSING AUTHORITY; and IMAGINEERS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) | |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................ii

INTRODUCTION .................................................................................................................. 1

THE PARTIES.....................................................................................................................13

    Plaintiffs .........................................................................................................................13

        Center for Leadership and Justice..........................................................................13

        Individual Plaintiffs ..............................................................................................16

    Defendants .......................................................................................................................20

JURISDICTION ...................................................................................................................21

VENUE ..............................................................................................................................21

FACTUAL ALLEGATIONS ..................................................................................................22

    Hartford's Segregated Neighborhoods Disadvantage the Families and Children Who Live There ...............................................................................................................22

    Defendants' Policies Have Perpetuated Segregation in Hartford ....................................26

    The Deplorable Conditions at The CARA, Barbour Gardens, and Infill Buildings.........30

    The Families Fought to Cancel the Buildings' HAP Contracts and Sought to Relocate.........................................................................................................................32

    HUD Provided Vouchers to the Families .........................................................................34

    Hartford Housing and Hartford Became Voucher Administrators ...................................36

    Defendants Provided Inadequate Relocation Assistance to the Families .........................38

        1. Defendants Provided Discriminatory Relocation Services that Did Not Include Mobility Counseling ................................................................................40

        2. Defendants Gave the Families Insufficient Time to Relocate ..........................50

            A. HUD and Hartford Housing Gave the CARA Families Insufficient Time to Relocate........................................................51

            B. The Barbour Gardens and Infill Families Were Also Given Insufficient Time to Relocate........................................................54

3. HUD and Hartford Housing Failed to Ensure that the CARA, Barbour Gardens, and Infill Families Could Move Freely Within the Greater Hartford Area ....................................................................................................... 57

    A.     HUD Failed to Appoint a Regional Voucher Administrator with the Best Payment Standards .................................................... 57

    B.     Hartford Housing Made it Difficult CARA and Infill Families to Move to Higher Opportunity Areas .......................... 60

Defendants' Failures Caused the Families to Relocate to Racially Segregated, Lower-Opportunity Areas ............................................................................... 61

Defendants' Failures Reflect a Broader Practice That is Likely to Recur ................... 66

HUD Re-Subsidized CARA and Barbour Gardens ......................................... 68

CLASS ACTION ALLEGATIONS ................................................................. 70

CAUSES OF ACTION .................................................................................. 75

COUNT I – Acting Contrary to Law and/or in an Arbitrary and Capricious Manner Regarding Relocations (HUD) ......................................................... 75

COUNT II – Fair Housing Act Regarding Relocations (Hartford Housing) ................... 78

COUNT III – Fair Housing Act Regarding Relocations (Hartford & Imagineers) .......... 79

COUNT IV – Acting Contrary to Law and/or in an Arbitrary and Capricious Manner Regarding Resubsidization (HUD) ....................................................... 81

PRAYER FOR RELIEF ................................................................................ 83

JURY DEMAND ......................................................................................... 84

Plaintiffs Shawanda Breedlove, Cyvonne Cook, Trinity Claudio, Tammy Davis, Yulissa Espinal, Stephanie Grant, Marina Ilarraza, Ashley Matos, Mirna Medina, Milagros Ortiz, Maritza Rosario, and Netzabilie Torres (collectively, the "Individual Plaintiffs"), individually and on behalf of all others similarly situated, and Center for Leadership and Justice ("CLJ") (collectively, "Plaintiffs"), through their attorneys, Jerome N. Frank Legal Services Organization, Open Communities Alliance, Lawyers' Committee for Civil Rights Under Law, and Covington & Burling LLP, allege the following against Defendants United States Department of Housing and Urban Development ("HUD"); Marcia L. Fudge, in her official capacity as Secretary of United States Department of Housing and Urban Development; Housing Authority of the City of Hartford ("Hartford Housing"); the City of Hartford d/b/a The City of Hartford Housing Authority ("Hartford"); and Imagineers, LLC ("Imagineers").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of the undersigned counsel.

## <u>INTRODUCTION</u>

1.      Congress enacted the Fair Housing Act ("FHA") in 1968, to combat decades of discriminatory housing practices that have resulted in pernicious patterns of racial segregation throughout the United States. In passing the FHA, Congress expressly charged HUD and other entities that operate federal housing programs with an affirmative duty to further the Act's fair housing goals. *See* 42 U.S.C. § 3608(d), (e)(5). As the Second Circuit has explained, that statutory duty requires HUD and public housing authorities to "as much as possible," fulfill "the goal of open, integrated residential housing patterns," and to "prevent the increase of segregation." *Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973).

2.     Over fifty years after the passage of the FHA, much of the United States remains highly segregated.  The Hartford metropolitan area[1] ("Greater Hartford") is one of those places.  Areas like North Hartford, in which the Individual Plaintiffs have resided, have a disproportionately high concentration of Black and Hispanic[2] residents—less than 2% of the population there is white,[3] even though the population of Greater Hartford is 67.8% white.

3.     Six years ago, HUD described the area of North Hartford where these racially segregated[4] neighborhoods are located as "one of the poorest [areas] in the country," with "alarmingly high rates of unemployment, violent crime, and food insecurity."[5]  Research has shown that children raised in racially segregated, high-poverty areas like North Hartford are less likely to graduate high school, less likely to go to college, and have lower incomes than children with similar racial and socioeconomic backgrounds who are raised in less racially segregated, higher-opportunity areas.

4.     Had HUD embraced its statutory mandate to promote "open, integrated residential housing patterns," it could have taken any number of measures over the past fifty years to combat segregation in Hartford.  It could have funded community-based revitalization efforts in North Hartford.  It could have ensured public housing or subsidized housing developments in

---

[1] The U.S. Census Bureau refers to this area as the "Hartford-West Hartford-East Hartford, CT Metro Area."

[2] The word "Hispanic" is used throughout this Complaint to refer to people who identify themselves as "Hispanic or Latino," as defined by the Census Bureau.  The use of this term is not intended to suggest that the word "Hispanic" is preferable to terms such as "Latino" or "Latinx."

[3] For purposes of brevity, the word "white" is being used throughout this Complaint to refer to people who identify as white, but do not identify as Hispanic.  The Census Bureau refers to this group as "white alone, not Hispanic or Latino."

[4] For purposes of this Complaint, "racially segregated" means areas that have disproportionately high numbers of Black and/or Hispanic residents.

[5] *North Hartford Promise Zone*, HUD.gov, Apr. 2015, https://www.hudexchange.info/sites/ onecpd/assets/File/Promise-Zone-Designee-North-Hartford.pdf.

less segregated areas.  And HUD—as well as the other Defendants—could have actively recruited landlords in less segregated, higher-opportunity areas to accept housing voucher recipients instead of discriminating against them.

5.      But HUD and the other Defendants have done none of these things.  Instead, they have made the problem *worse*.  HUD's administration of housing assistance programs for low-income families in Hartford—who are disproportionately Black and Hispanic—includes both subsidized housing units under the Project-Based Rental Assistance program ("PBRA") and housing vouchers that can be used to rent from any private landlord under the Housing Choice Voucher program ("HCV").  Rather than making PBRA units available in places like Farmington or Glastonbury, HUD has largely chosen to concentrate them in racially segregated neighborhoods like North Hartford.  And rather than attempting to overcome the barriers that voucher recipients face when seeking to move to an integrated, higher-opportunity area, HUD—and the other Defendants, who help HUD administer vouchers in the Greater Hartford area—have effectively steered these families into racially segregated, high-poverty neighborhoods.

6.      That includes the Individual Plaintiffs in this case, all of whom resided in three HUD-subsidized PBRA properties in North Hartford—Clay Arsenal Renaissance Apartments ("CARA"), Barbour Gardens Apartments ("Barbour Gardens"), and Infill I ("Infill").  HUD subsidized these properties for years even though they were located in highly segregated, high poverty neighborhoods and even though they repeatedly failed safety inspections.  By 2018 and 2019, the building conditions worsened to the point that HUD agreed to terminate its contracts with the landlords and provide the families with HCV vouchers that would allow them to relocate to any one of the thousands of market-rate housing units available in Greater Hartford.

7.      The families eagerly embraced this chance to move to a higher-opportunity neighborhood.  But HUD and the other Defendants proceeded to rush the families through the relocation process.  And they failed to provide adequate relocation services which—in HUD's own words—are "critically important" to overcoming discriminatory barriers and counteracting residential segregation.  The predictable result was that the vast majority of families were unable to secure a lease outside of North Hartford or other heavily segregated, low-opportunity neighborhoods.  To make matters worse, rather than using the newly-released PBRA subsidies to fund housing units in higher-opportunity areas, HUD decided to resubsidize two of the very same buildings—doubling down on residential segregation in Greater Hartford.

8.      Under the PBRA program, HUD pays landlords to provide subsidized housing to low-income tenants under long-term Housing Assistance Payment ("HAP") contracts with those landlords.  Because the subsidy HUD provides under these HAP contracts is tied to the property, tenants cannot leave the property without losing the subsidy.  For some, this subsidy is the only thing keeping them from becoming homeless, meaning that moving is not an option.  Even if building conditions are deplorable, the residents living there have no choice but to stay.

9.      This was true for the families living in CARA, Barbour Gardens, and Infill, who endured substandard conditions for years.  The conditions at CARA were so bad that a social worker prohibited a mother from bringing her newborn there, and Hartford Mayor Luke Bronin threatened to bring criminal charges against the owner.  After visiting Barbour Gardens, U.S. Senator Christopher Murphy commented that the property was "inhumane and totally unhealthy" and that the owner was "getting wealthy off of housing that is falling down around the

residents."[6]  Inspections of Infill found rats, mice, cockroaches, flooding, mold, exposed wires, blocked emergency exists, a collapsed ceiling, and missing toilets.

10.     In addition to the decrepit condition of the housing units, these properties were located in unsafe areas.  From 2012 to 2018, nearly 400 gunshots were detected by a police sensor in the Clay Arsenal area where CARA is located.  Barbour Gardens and Infill are located less than two miles north of CARA, in the North End neighborhood.  Residents of Barbour Gardens saw, heard, and sometimes felt the impact of bullets grazing the buildings.  One of the Infill residents once found a child who had been shot in the Infill parking lot.  For these reasons, many residents were concerned for their children's safety and would not allow them to play outside.

11.     Although the conditions and locations of all three buildings posed health and safety hazards to the residents, HUD continued to maintain its HAP contracts with the owners and gave them chance after chance to fix the properties.  But the owners never fixed the properties, which instead deteriorated further.  For example, as a result of neglect by the owner of Barbour Gardens, the basement of two of the buildings there flooded with sewage water, dead cats, rats, and fleas in 2019.

12.     Residents in the three buildings and local activists refused to accept these inhumane conditions.  In 2017, Plaintiff Center for Leadership and Justice ("CLJ"), a community-based organization in Hartford, began a "No More Slumlords" campaign, through which it helped residents organize, participate in press conferences, and lobby local leaders.

---

[6] Rebecca Lurye, *Lawmakers say HUD is complicit in 'inhumane' conditions at Hartford housing project*, Hartford Courant, Mar. 11, 2019, *available at* https://www.courant.com/ community/hartford/hc-news-senators-touring-barbour-gardens-20190311- cbxcsurbyjfopiy7jugufxzjci-story.html.

13.     Only after months of pressure from CLJ and residents did HUD finally relent, agreeing to abate, or terminate, its HAP contract with the owners of CARA, Infill, and Barbour Gardens.  As part of those abatements, HUD provided the families living there with HCV vouchers that would theoretically permit them to move to private rental units across the country.

14.     HUD asked whether Defendant Housing Authority of the City of Hartford ("Hartford Housing") would accept responsibility for administering vouchers for the CARA and Infill families.  In response, Hartford Housing filled out funding applications and requested appointment as voucher administrator for those families.[7]  Defendant City of Hartford ("Hartford") similarly filled out a funding application for it and Imagineers, LLC ("Imagineers") to take on responsibility as voucher administrator for the Barbour Gardens families.[8]  Hartford Housing, Hartford, and Imagineers all had the choice not to apply to serve as voucher administrators.  HUD ultimately appointed the entities as voucher administrators and provided substantial funding to Hartford Housing, Hartford, and Imagineers.   Hartford Housing receives funding (and administrative fees) from HUD based on the number of vouchers it administers.  The more vouchers it obtains and administers, the more money it receives from HUD.  For example, with respect to the CARA relocation alone, Hartford Housing received millions of dollars to administer the vouchers for families in connection with that relocation.[9]  This funding was in addition to the hundreds of millions of dollars that Hartford and Hartford Housing have

---

[7] *See* Exs. 1 (Letter from J. Elazhari to A. Sanderson, dated May 29, 2018, and Funding Application, dated May 29, 2018) and 2 (Letter from J. Elazhari to A. Sanderson, dated February 14, 2019, and Funding Application, dated February 14, 2019).

[8] Ex. 3 (Funding Application, dated March 7, 2019).

[9] Ex. 4  (Letter from R. Byers to Hartford Housing, dated June 11, 2018).

received from HUD for administering Section 8 vouchers.[10] By submitting their applications, accepting HUD's funding, and voluntarily taking on the responsibility of serving as voucher administrators for the families, Defendants Hartford Housing, Hartford, and Imagineers each accepted their duties under the FHA and HUD's regulations to assist the families with their relocations. Indeed, the funding applications they signed explicitly reference duties to comply with the FHA.[11]

15. With the knowledge of Defendants, HUD used Leumas Residential LLC ("Leumas") to assist in providing relocation services to the families. After obtaining work orders with HUD for these buildings, Leumas set up meetings with the families, along with Defendants Hartford Housing and Imagineers, to discuss the families' new vouchers and relocation benefits.

16. The families living in these buildings perceived this as a new beginning. One tenant said to the Hartford Courant: "I think the air's different. This feeling—it's surreal. It's been a long journey and we had to fight, but we won today."[12] At their preliminary meetings, Defendants told the families that they could use their vouchers anywhere in the country. One tenant believed the relocation would be her "salvation."

17. The families had good reason to be excited. Months earlier, as part of a court judgment, HUD was ordered to implement a policy under which voucher holders are given

---

[10] *See* USA Spending.gov, https://www.usaspending.gov/recipient/f857dda6-a444-c3c8-4bc9-4773ff83ea0b-R/all (accessed May 14, 2021); USA Spending.gov, https://www.usaspending.gov/recipient/4843ca0b-73be-5afa-0b8b-071de9128250-P/all (accessed May 14, 2021).

[11] *See, e.g.*, Ex. 3 at 2 ("The HA will comply with the Fair Housing Act (42 U.S.C. 3601-19).").

[12] Matthew Ormseth, *After Years of Mismanagement And Neglect, Federal Authorities Will Terminate Notorious Landlord's Contract In Hartford*, Hartford Courant, May 31, 2018, *available at* https://www.courant.com/news/connecticut/hc-news-hartford-clay-arsenal-apartments-20180522-story.html.

higher payment standards—essentially the purchasing power of the voucher—in less racially segregated, higher-opportunity areas.[13]  For this reason, the value of their vouchers should have been sufficient to allow the families to move to those areas.  And housing data collected from the Census Bureau further confirms that units were available there within their budget.

18.     Despite the availability of homes in less racially segregated areas, the vast majority of families were stymied in their efforts to secure leases there before their vouchers and relocation benefits were scheduled to expire.  Although the families worked diligently to find new homes, Defendants failed to provide accurate information about the value of their vouchers in those areas, which resulted in uncertainty about whether they could afford those units.  Moreover, when they did find a place, they frequently faced discrimination from landlords who unlawfully told them they "did not accept Section 8 vouchers" or who simply did not return their calls.  In the face of these barriers and an imminent deadline that could mean losing their vouchers and relocation benefits, including security deposit funds, many families were forced to give up their search for a higher-opportunity neighborhood.  The vast majority stayed in racially segregated, low-opportunity areas.  Some moved just blocks away from their old buildings.

19.     The inability of the Individual Plaintiffs and other families to move out of their highly segregated neighborhoods was the direct result of Defendants' failure to comply with their statutory mandate in administering the relocation program.  Because of Defendants' inadequate relocation policies, the families were left with no choice but to stay or settle once again in racially segregated, low-opportunity areas.

20.     Defendants' relocation program failed for three primary reasons:

---

[13] *Open Communities Alliance v. Carson*, 1:17-CV-02192 (D.D.C.).

21.     *First*, the relocation program did not include adequate mobility counseling services, which are proven to help residents move to less racially segregated, higher-opportunity areas.  These services include proactively building relationships with landlords in those areas, informing them about the HCV program and their duties under state law, and reducing stigma surrounding the program; using that recruitment to generate lists of available units in higher-opportunity areas and making introductions between those landlords and voucher holders; teaching voucher holders how to communicate with landlords in those areas and overcome any discriminatory conduct; ensuring voucher families have the information needed to search for and obtain housing in different towns; and providing credit checks and counseling to tenants and landlords, so that any issues with credit scores can be addressed.

22.     HUD has known about the importance of mobility counseling services for decades.  In 1996, HUD recognized that mobility assistance is "critically important" to help voucher holders "move to low poverty or non-minority neighborhoods."  That same year, HUD agreed to provide these services as a partial settlement of a landmark fair housing case in Baltimore.  As a result of the settlement, over 90% of people who participated in the mobility program were able to move to low-poverty, racially-integrated areas.  HUD has provided mobility counseling services in connection with other settlements as well, and, in 2000, it expressly identified these services as one of its tools to "undo t[he] legacy" of racial segregation.[14]

23.     The importance of mobility counseling services is well-known to Defendants Hartford, Hartford Housing, and Imagineers as well.  For example, Hartford Housing agreed to

---

[14] *Baseline Assessment of Public Housing Desegregation Cases: Cross-site Report*, HUD User (Nov. 14, 2020, 5:35 p.m.), https://www.huduser.gov/portal/publications/pubasst/baseline.html.

create a mobility counseling program as part of a 1998 settlement agreement that resolved a case that similarly alleged Hartford Housing denied "adequate housing choices to tenants relocated" from subsidized housing and who received Section 8 vouchers.[15] And from 1992 until at least 1996, Hartford and Imagineers provided a mobility program in coordination with the Housing Education Resource Center.[16] According to a report that HUD provided to Congress, this mobility program included taking "clients on community tours, accompany[ing] them on visits to specific housing units, connect[ing] households to social services, and provid[ing] assistance as clients request it at all stages of the process."[17] In 1996, HUD commissioned a report about these efforts called "Learning from Each Other: New Ideas for Managing the Section 8 Certificate and Voucher Programs."[18] And more recently, in January 2020, the Mayor of Hartford criticized the failure to provide mobility counseling services as part of the relocations here.

24. Despite the well-established need for mobility counseling services, HUD hired Leumas under contracts and work orders that did not direct Leumas to provide mobility counseling services, counteract segregation, or help people move to higher-opportunity areas. And although Hartford Housing, Hartford, and Imagineers each had an independent duty to

---

[15] *See Pitt v. Hartford Housing Authority*, 97-cv-2019 (JBA), Plaintiffs' Motion for Court Approval of Proposed Settlement Agreement, Ex. A at 1, *available at* https://www.clearinghouse.net/chDocs/public/PH-CT-0003-0001.pdf.

[16] Finkel et al., "Learning from Each Other: New Ideas for Managing the Section 8 Certificate and Voucher Programs," Prepared for HUD, Sept. 1996, *available at* https://www.huduser.gov/portal/Publications/pdf/learning.pdf

[17] Promoting Housing Choice in HUD's Rental Assistance Programs: A Report to Congress, Apr. 1995, at 58.

[18] Finkel et al., "Learning from Each Other: New Ideas for Managing the Section 8 Certificate and Voucher Programs," Prepared for HUD, Sept. 1996, *available at* https://www.huduser.gov/portal/Publications/pdf/learning.pdf

ensure the relocations enabled the families to access more integrated neighborhoods, those Defendants created a relocation program that did not include core mobility counseling services. As a result, Defendants' relocation program predictably resulted in the families moving to racially segregated, high-poverty areas.

25.     *Second*, Defendants provided unreasonable deadlines for when these families were required to move.  Failure to comply with these deadlines would have resulted in families losing their relocation benefits, their vouchers, or both, depriving them of the housing assistance on which they depend.  Indeed, for some families, this subsidy was their most valuable asset, and they could potentially become homeless without it.  These onerous deadlines predictably forced families to choose to find more easily-available units in Hartford rather than obtaining housing in less racially segregated areas.

26.     *Third*, HUD failed to provide the families with a regional voucher administrator that had authority to approve moves outside Hartford city limits and that had the best payment standards.  Instead, the voucher administrator assigned to the CARA and Infill families— Hartford Housing—was able to only approve moves to areas within city limits.  This compounded the challenges for the CARA and Infill families because it meant that before they could move beyond the Hartford city limits, they would first need to "port," or transfer, their voucher to another housing authority.  Porting is an administratively complicated process that a program manager for Hartford Housing has noted can take up to "a month."[19]  In addition to confusing many of the residents, it slowed them down, increasing the time pressure they already felt.

---

[19] Matthew Ormseth, *Ticket To A New Life: Federal Vouchers May Open Doors For Residents Of Dilapidated Housing In Hartford*, Aug. 16, 2018, https://www.courant.com/news/connecticut/ hc-news-ku-tenants-relocate-20180723-story.html

27.     Although HUD did appoint a regional voucher administrator to the Barbour Gardens families—Hartford and Imagineers—that administrator had worse payment standards in higher-opportunity areas than another administrator HUD could have chosen, the Connecticut Department of Housing.  These lower payment standards unnecessarily deprived the families of options in higher-opportunity areas, as it meant that certain units would be outside of their price range.

28.     Hartford, Hartford Housing, and Imagineers independently chose to take on the responsibility of becoming voucher administrators.  Had any of these Defendants believed they were not capable of adequately relocating the families—as proved to be the case—they could have chosen not to serve as voucher administrators.  Instead, they applied for these roles, accepted responsibility for relocating the families, and received funding and compensation to do so.

29.     As a result, the Defendants, who devised the relocation program and were responsible for its operation, perpetuated segregation in Greater Hartford by causing the predominantly Black and Hispanic residents of CARA, Barbour Gardens, and Infill to move to areas that are racially segregated and have disproportionately high concentrations of poverty.  In doing so, they violated their obligations under the FHA.

30.     Further, after the CARA and Barbour Gardens families moved, HUD decided to resubsidize those properties rather than using those funds to create opportunities in less racially segregated areas.  At the time of this filing, CARA has been resubsidized and new tenants have moved there.  HUD has also approved a partial resubsidization of Barbour Gardens, but that building has not yet opened for re-occupancy.

31.     Although it is not yet clear whether the renovations to CARA and Barbour Gardens have improved those properties, building renovations do not make the area safe or improve schools.  The children who are raised in those buildings—almost all of whom are or will likely be Black or Hispanic—will have fewer opportunities than children raised in predominantly white, neighboring areas.  By choosing to place these subsidies in North Hartford, Defendants both perpetuated segregation in North Hartford and deprived low-income families of the choice to live in less racially segregated, higher-opportunity areas.  Rather than embracing their affirmative duty to counteract segregation, Defendants instead perpetuated it.

32.     Plaintiffs deserve a meaningful chance to relocate to higher-opportunity areas, as they have wanted all along.  Defendants should be required to take all necessary actions to place the families in the position they would have been in had Defendants provided proper relocation assistance to them in the first place.  This includes providing the Plaintiffs with mobility counseling services, providing them with sufficient time to relocate, transferring them to a regional administrator with the best payment standards, and creating a fund to help them relocate, including assistance with breaking their current rental obligations.  Furthermore, HUD's policy of placing subsidized housing in racially segregated areas should be declared unlawful, and Defendants should be required to counteract the segregation they have perpetuated in North Hartford.

## THE PARTIES

### Plaintiffs

### Center for Leadership and Justice

33.     Plaintiff Center for Leadership and Justice ("CLJ") is a Connecticut non-profit organization with its principal place of business located at 47 Vine Street, Hartford, CT 06112.  Founded in 1850 to address "the plight of the poor and new immigrants in Hartford," CLJ's

mission has included housing-related community advocacy and organizing since the 1950s.  CLJ was initially named the Christian Activities Council and renamed itself as the Center for Leadership and Justice in October 2019.

34.     CLJ first began addressing housing conditions at CARA after receiving a telephone call from a staff member of a Hartford elementary school about a student with mice bites.  Had the school not called CLJ, and had CLJ not agreed to investigate, the school's other options would have been to call the Connecticut Department of Children and Families or 311.  After meeting with the child's mother and canvassing neighbors, CLJ learned that the mouse problem was not confined to the particular unit.  For that reason, CLJ began working with tenants to organize against the landlord, Emmanuel Ku, to pressure him to address the deplorable housing conditions there.

35.     In 2017, CLJ launched a "No More Slumlords" campaign directed against Mr. Ku.  As part of that campaign, CLJ organized residents, held press conferences, and contacted elected officials to publicize the decrepit conditions at CARA.  This was a major effort because CARA has a large footprint, consisting of 25 buildings and comprising 26% of the market of HUD-subsidized five bedroom and larger apartments in Hartford.[20]  CLJ held meetings with many stakeholders, including HUD, Hartford, and CARA residents.  As a result of their efforts, HUD terminated its contract with Mr. Ku in or about 2018.

36.     Starting in the fall of 2018, CLJ was involved in organizing families who lived in Barbour Gardens and Infill.  Barbour Gardens has 84 units, and Infill has 52 units.  Barbour

---

[20] Matthew Ormseth, *After Years of Mismanagement And Neglect, Federal Authorities Will Terminate Notorious Landlord's Contract In Hartford*, Hartford Courant, May 31, 2018, https://www.courant.com/news/connecticut/hc-news-hartford-clay-arsenal-apartments-20180522-story.html.

Gardens and Infill residents contacted CLJ after learning about CLJ's role working with residents to seek the termination of the CARA HAP contract. As a result of CLJ's organizing efforts, HUD terminated its contracts with the owners of those properties in 2019.

37. HUD reassured CLJ that residents would get top-notch relocation services. But in or about August 2018, CLJ became aware that the CARA families were not receiving those services. For that reason, CLJ stepped in to assist the families with the relocation and to serve as advocates throughout that process. When Defendants similarly did not provide the Infill and Barbour Gardens families with sufficient relocation services, CLJ helped with their relocation as well. For example, CLJ:

    a.    assisted residents by accompanying them to meetings with Hartford Housing and Leumas, providing translation services, and driving families to higher-opportunity areas to find potential housing;

    b.    knocked on doors and flyered residents' apartments to keep them informed about the status of the relocation;

    c.    organized informational meetings, including arranging for food and venues, to educate residents about the relocation process and portability;

    d.    surveyed tenants about where they wanted to move and organized volunteers to search for properties with residents; and

    e.    advocated for them by raising issues in meetings with HUD, Hartford Housing, Imagineers, and Leumas.

38. To adequately support the residents' relocation efforts, CLJ's staff shifted responsibilities, reallocated their resources, and put other planned projects on hold:

    a.    Executive Director Cori Mackey had planned to spend approximately three-quarters of her time launching the Greater Hartford Interfaith Action Alliance (GHIAA), a group that now includes 35 congregations in greater Hartford focused on five social justice initiatives throughout Connecticut. Instead, she worked around the clock with the relocating families and also had

to prioritize pursuits of grant funding to support this campaign. For that reason, GHIAA was launched later than planned.

b. Organizer Pastor A.J. Johnson had expected to work on other campaigns, including helping parents advocate regarding the proposed closure of the Martin Luther King School, but instead he dedicated the vast majority of his time to housing issues.

c. Although Organizer Tieasha Gayle ordinarily spent all of her time engaging in parent leadership development in nearby schools and planning CLJ's summer program for youths, Ms. Gayle had to spend more than half of her time on housing organizing.

d. CLJ hired tenant leader Joshua Serrano on a part-time basis to further assist with the tenant relocations.

### Individual Plaintiffs

39.     Plaintiff Shawanda Breedlove is a Black woman who lives in Hartford, Connecticut. With the exception of about 5 years, Ms. Breedlove lived in Infill from the 1970's to 2019. After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford, possibly to West Hartford, Windsor, or Bloomfield. Instead, as a result of failures by HUD and Hartford Housing, she moved from Infill to an apartment mere blocks away in Hartford. The census tract[21] where she moved is 4.9% white and has a poverty concentration of 44.3%.

40.     Plaintiff Cyvonne Cook is a Black woman who lives in Hartford, Connecticut with her five children. Ms. Cook lived in CARA for four years. After receiving a voucher from HUD, she wanted to move out of Hartford. Instead, as a result of failures by HUD and Hartford Housing, she was unable to move out-of-state or secure a lease in a more integrated, higher-

---

[21] "Census tracts" are geographic subdivisions that the U.S. Census Bureau creates for data tracking purposes that generally have a size of between 1,200 and 8,000 people. Created with the purpose of "provid[ing] a stable set of geographic units for the presentation of statistical data," they are often considered superior to other geographic boundaries for comparing areas. *Glossary*, United States Census Bureau, https://www.census.gov/programs-surveys/geography/about/glossary.html.

opportunity town near Hartford and instead moved to an apartment in the South End of Hartford. The census tract where she moved is 12.4% white and has a poverty concentration of 38.4%.

41.     Plaintiff Trinity Claudio is a Black and Hispanic woman who lives in Hartford, Connecticut, with her two children.  From 2010 to 2018, Ms. Claudio lived in CARA.  After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford, possibly to Florida.  Instead, as a result of failures by HUD and Hartford Housing, she moved from CARA to an apartment in Hartford that was previously occupied by her friend, and that is located in a census tract that is 7% white and has a poverty concentration of 50.2%.

42.     Plaintiff Tammy Davis is a Black woman who lives in Hartford, Connecticut. From 2018 to 2019, Ms. Davis lived in Barbour Gardens.  After receiving a voucher from HUD, Hartford, and Imagineers, she sought to move outside of North Hartford and considered trying to move to areas like Rocky Hill, Wethersfield, or Cromwell.  Instead, as a result of failures by HUD, Hartford, and Imagineers, she moved from Barbour Gardens to an apartment in Hartford, located in a census tract that is 37.5% white and has a poverty concentration of 47.4%.

43.     Plaintiff Yulissa Espinal is a Hispanic woman who lives in New Britain, Connecticut, with her four children.  From 2011 to 2018, Ms. Espinal lived in CARA.  After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford and considered moves to areas like Newington, Rocky Hill, or West Hartford, all of which are less racially segregated and have a lower average poverty concentration than North Hartford.  Instead, as a result of failures by HUD and Hartford Housing, Ms. Espinal moved from CARA to a census tract in New Britain that is 52.5% white and has a poverty rate of 16.4%.

44.     Stephanie Grant is an Black woman who lives in Hartford with her fourteen-year-old son.  She lived in Infill for twenty-five years.  After receiving her voucher from HUD and

Hartford Housing, she wanted to move out of Hartford to a home in a safe neighborhood with good schools and a low crime rate. Instead, as a result of failures by HUD and Hartford Housing, Ms. Grant moved from Infill to another apartment in the North End, less than a mile from Infill, where the census tract is 3% white and has a poverty concentration of 45%.

45.    Plaintiff Marina Ilarraza is a Hispanic woman who lives in Hartford, Connecticut, with her three children. From 2017 to 2019, Ms. Ilarraza lived in Barbour Gardens. After receiving a voucher from HUD, Hartford, and Imagineers, she sought to leave North Hartford and considered trying to move to areas like Bloomfield, Manchester, or West Hartford, all of which are less racially segregated and have lower average poverty concentrations than North Hartford. Instead, as a result of failures by HUD, Hartford, and Imagineers, Ms. Ilarraza moved from Barbour Gardens to an apartment in a census tract of Hartford that is 7% white and has a poverty concentration of 50.2%.

46.    Plaintiff Ashley Matos is a Hispanic woman who lives in Hartford, Connecticut, with her three children. From 2011 to 2019, Ms. Matos lived in Infill. After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford and considered trying to move to other towns, including Manchester or West Hartford, both of which are less racially segregated and have lower average poverty concentrations than North Hartford. Instead, as a result of failures by HUD and Hartford Housing, Ms. Matos moved from Infill to an apartment in the Sheldon Charter Oak neighborhood of Hartford that she found by herself. The census tract where she moved is 12.4% white and has a poverty concentration of 38.4%.

47.    Plaintiff Mirna Medina is a Hispanic woman who lives in Hartford, Connecticut. From 2012 to 2018, Ms. Medina lived in CARA. After receiving a voucher from HUD and Hartford Housing, she was interested in moving outside of North Hartford. Instead, as a result of

failures by HUD and Hartford Housing, she moved from CARA to an apartment in Hartford that she found by herself, the census tract of which was 5.4% white and has a poverty concentration of 31.1%. Two years later, she moved to another census tract in Hartford that is 4.9% white and has a poverty concentration of 49.2%.

48.     Plaintiff Milagros Ortiz is a Hispanic woman who lives in Hartford, Connecticut, with her three children. From 2015 to early 2019, Ms. Ortiz lived in CARA. After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford, and considered moving to various towns including West Hartford, Avon, Windsor, Bloomfield, East Hartford, and Manchester. Instead, as a result of failures by HUD and Hartford Housing, Ms. Ortiz moved from CARA to an apartment in Hartford. The census tract where she relocated is 33.2% white and has a poverty concentration of 26.5%. Soon after she moved in, there were problems in the apartment—including a loss of heat during the winter—which the landlord failed to address. Less than three months after Ms. Ortiz moved in, Hartford Housing gave notice that it was terminating the Section 8 contract and directed Ms. Ortiz to move out promptly. With no rent coming in, the landlord moved to evict Ms. Ortiz, issuing her a notice to quit. Ms. Ortiz moved to a second unit in a census tract of Hartford that is 17.3% white and has a poverty concentration of 21.2%.

49.     Plaintiff Maritza Rosario is a Hispanic woman who lives in Hartford, Connecticut, with her two children. From 2015 to 2019, Ms. Rosario lived in Barbour Gardens. After receiving a voucher from HUD, Hartford, and Imagineers, she sought to move outside of North Hartford, and considered moving to Bloomfield, East Hartford, or West Hartford, all of which are less racially segregated and have lower poverty concentrations than Hartford. Instead, as a result of failures by HUD, Hartford, and Imagineers, Ms. Rosario moved from Barbour

Gardens to an apartment in a census tract of Hartford that is 14% white and has a poverty concentration of 38.4%.

50.  Plaintiff Netzabilie Torres is a Hispanic woman who lives in Hartford, Connecticut, with her children.  From 2004 to 2019, Ms. Torres lived in Infill.  After receiving a voucher from HUD and Hartford Housing, she sought to move outside of North Hartford, and she considered moving to Windsor.  Instead, as a result of failures by HUD and Hartford Housing, Ms. Torres moved from CARA to an apartment in a census tract of Hartford that is 7% white and has a poverty concentration of 50.2%.

## **Defendants**

51.  Defendant United States Department of Housing and Urban Development ("HUD") is the federal agency responsible for providing, *inter alia*, federal subsidized housing to Americans.  HUD subsidized the buildings in which the Individual Plaintiffs lived, was responsible for relocating the Individual Plaintiffs after terminating its subsidy with those buildings, and funds the HCV subsidies that the Individual Plaintiffs currently hold.

52.  Defendant Marcia L. Fudge is the current Secretary of HUD and is named as a Defendant in her official capacity.  In or about June 2018, Ms. Fudge's predecessor, Secretary Benjamin S. Carson, met with the CARA families in his official capacity as Secretary of HUD and said he would help them with their relocation.

53.  Defendant Housing Authority of the City of Hartford ("Hartford Housing") is a public housing authority that is authorized by HUD to administer vouchers within Hartford city limits.  Its principal place of business is 180 John D. Wardlaw Way, Hartford, CT 06106.  In or about July 2018, Hartford Housing applied for and accepted responsibility as the voucher administrator for the Individual Plaintiffs and other families who relocated from CARA.  On or

about February 14, 2019, Hartford Housing applied for and accepted responsibility as the voucher administrator for the Individual Plaintiffs and other families who relocated from Infill I.

54.     Defendant City of Hartford ("Hartford") is the capital city of and third largest municipality in Connecticut.  Hartford also operates as a public housing authority that does business as "City of Hartford Housing Authority" and has been authorized by HUD to administer vouchers.  In or about March 2019, Hartford accepted responsibility as the voucher administrator for the Individual Plaintiffs and other families who relocated from Barbour Gardens.

55.     Defendant Imagineers, LLC ("Imagineers") is a Connecticut domestic limited liability company with its principal place of business located at 635 Farmington Ave, Hartford, CT 06105.  Hartford contracts with Imagineers to provide the voucher administration services that it would otherwise provide.  For that reason, Imagineers acted as the voucher administrator for the Individual Plaintiffs and other families who relocated from Barbour Gardens.

## JURISDICTION

56.     This Court has subject matter jurisdiction over the claims in this action because they arise under federal law.  *See* 28 U.S.C. § 1331.

57.     This Court has personal jurisdiction over Defendants because they do business in this District and because the events giving rise to the claims occurred in and arose out of Defendants' conduct in this District.  *See* Fed. R. Civ. P. 4(k).

## VENUE

58.     Venue is proper in this District because the events giving rise to the unlawful conduct alleged in this Complaint occurred in this District.  *See* 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### Hartford's Segregated Neighborhoods Disadvantage the Families and Children Who Live There

59.    Hartford is highly segregated.  Black and Hispanic residents are heavily

concentrated in the city center, which is less than 15% white.  By contrast, the populations of

nearby suburban towns in the Greater Hartford areas like Glastonbury and Wethersfield are over

80% white.

60.    The map below illustrates this.  Areas with large white populations are depicted in

yellow, and areas with disproportionately small white populations—and disproportionately large

minority populations—are depicted in dark purple.



61.     The map below illustrates how the highly-segregated areas in Hartford also tend to have disproportionately high concentrations of poverty.  The blue areas all have concentrations of poverty greater than the Greater Hartford average of 10.1%.  This means that over 10.1% of people in those areas have incomes that are below the federal poverty line.  HUD considers any poverty concentration over 40% to be "extreme."



62.     The families and children who are consigned to heavily segregated neighborhoods like the ones in North Hartford face diminished opportunities.  For example, research has found that segregated areas tend to have lower levels of safety than other areas and that Black people living in segregated areas tend to have lower incomes and are less likely to live to the age of

seventy-five than their white counterparts.[22]  Further, racial segregation is a "key lynchpin of highly concentrated poverty."[23]

63.     Research has also shown that the neighborhoods where children grow up affect their life opportunities, even when compared to other children of the same race and socioeconomic status.  For example, in August 2015, researchers from Harvard University found that people who moved to higher-opportunity areas when they were children were 16% more likely to attend college, earned 31% more by their mid-twenties, and were less likely to be single parents, as compared to similar children who stayed in lower-opportunity areas.[24]

64.     A fact sheet published by HUD in 2015 describes the North Hartford neighborhoods where Plaintiffs resided—and where over 98% of the residents are minorities—as some "of the poorest in the country" and notes that they have "alarmingly high rates of unemployment, violent crime, and food insecurity."[25]  As of 2015, per capita annual income was $12,099, and only about one third of residents had a high school degree.[26]

---

[22] Ioana Popescu et al., *Racial Residential Segregation, Socioeconomic Disparities, and the White-Black Survival Gap*, PloS one (Feb. 23 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5825109/; Michael R. Kramer & Carol R. Hogue, Is Segregation Bad for Your Health, Epidemiologic Reviews (May 23, 2009), https://academic.oup.com/epirev/article/31/1/178/461128; Gregory Acs, et al., *The Cost of Segregation: National Trends and the Case of Chicago, 1990-2010*, The Urban Institute (March 2017), https://www.urban.org/sites/default/files/publication/89201/the_cost_of_segregation_final.pdf.

[23] Lincoln Quillian, *Segregation and Poverty Concentration: The Role of Three Segregations*, 77 Am. Sociological Rev. 354, 379 (Feb. 23, 2018), https://journals.sagepub.com/doi/pdf/10.1177/0003122412447793.

[24] Raj Chetty, Nathaniel Hendren & Lawrence F. Katz, *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment*, August 2015, https://scholar.harvard.edu/files/hendren/files/mto_paper.pdf.

[25] *North Hartford Promise Zone*, HUD.gov, Apr. 2015, https://www.hudexchange.info/sites/onecpd/assets/File/Promise-Zone-Designee-North-Hartford.pdf.

[26] *Id.*

65. Children raised in North Hartford have fewer opportunities than children raised in neighboring towns like Avon or Glastonbury. Based on data from Opportunity Insights, a non-profit based at Harvard University, children raised in the Clay Arsenal neighborhood of North Hartford earn $23,000 a year on average when they grow up.[27] Children raised in Glastonbury earn $69,000 on average. Seven percent of the children born in Clay Arsenal become incarcerated; less than 1% of children born in Glastonbury do. Almost all (99%) of the seniors at Glastonbury High School graduated high school in 2018 and over 86% entered college.[28] By contrast, only 79% of seniors at Journalism and Media Academy—a public high school located in North Hartford—graduated in 2018, and only 33% of those graduates have gone on to college.[29]

66. HUD's own indices also provide insight into the disparity between Clay Arsenal and neighboring towns like Glastonbury. For example, HUD tracks and keeps an index that summarizes the "level of employment, labor force participation, and educational attainment" in each census tract.[30] In 2017, Clay Arsenal had a 1—the lowest possible score—and Glastonbury had a 98. This means that Clay Arsenal has a lower score than 99% of the country. By contrast, Glastonbury had a higher score than 97% of the country.

---

[27] The data in this paragraph is available at https://www.opportunityatlas.org/, and was accessed on November 14, 2020. For the purposes of this paragraph, data for Clay Arsenal is from the census tract 09003501800, and data about Glastonbury is from the census tract 09003520400.

[28] Data from this and the next sentence comes from EdSight, a data portal maintained by the Connecticut State Department of Education that is available at http://edsight.ct.gov/. The data for Glastonbury High School, in particular, is available at http://edsight.ct.gov/Output/School/HighSchool/0546111_201819.pdf.

[29] *See id.* The data for Journalism and Media Academy, in particular, is available at http://edsight.ct.gov/Output/School/HighSchool/0647711_201819.pdf.

[30] This data is from HUD's Labor Market Engagement Index, which is available at https://hudgis-hud.opendata.arcgis.com/datasets/a739f7424ffc4825b3c72cb5b04fbccc_0.

67. HUD also maintains an "Environmental Health Hazard Index" that summarizes potential exposure to toxins in different areas, including air quality, respiratory, and neurological hazards.[31] In the last update from 2017, Clay Arsenal had an index of 31 and Glastonbury had an index of 74. This means that Clay Arsenal is more environmentally hazardous than 69% of the country, and that Glastonbury has a better environment than 73% of the country.

### Defendants' Policies Have Perpetuated Segregation in Hartford

68. Despite their statutory mandate to counteract segregation in Hartford, HUD and the local housing authorities have perpetuated segregation there in at least two ways.

69. *First*, HUD has concentrated subsidized housing—which disproportionately serves Black and Hispanic families—in racially segregated neighborhoods in Hartford, East Hartford, and New Britain that have disproportionately low white populations. The map below

---

[31] This data is from HUD's Environmental Health Hazard Index, which is available at https://hudgis-hud.opendata.arcgis.com/datasets/c7e2c62560bd4a999f0e0b2f4cee2494_0.

illustrates this point, with PBRA units depicted with red dots.



70.     Indeed, whereas Glastonbury has approximately 117 units subsidized under the

PBRA program, Clay Arsenal has 714 units subsidized under that program.  This is so even

though Glastonbury is approximately *five* times bigger than Clay Arsenal:  Glastonbury's

population is approximately 30,000, and Clay Arsenal's population is approximately 6,000.  By

choosing to place subsidized housing in areas that are already highly segregated, HUD has

caused the predominantly Black and Hispanic people in need of those subsidies to move to and

stay in those areas.

71.     *Second*, Defendants' management of the HCV programs in this area has

perpetuated racial segregation in Hartford.  Under that program, eligible families are provided

with vouchers they can use to rent housing units on the private market.  Although voucher

holders are theoretically able to move to any private rental unit in the country, Defendants'

policies and practices have led voucher holders to be concentrated in racially segregated, low-opportunity areas. The following diagram illustrates this, with voucher households represented by red dots.



72.     The following policies and practices, in particular, have concentrated voucher holders in these areas:

    a.     HUD, Hartford Housing, Hartford, and Imagineers have had a policy and practice of relocating voucher holders without mobility counseling services—despite knowing since at least 1996 that such services are "critically important" to helping recipients of subsidized housing "move to low poverty or non-minority neighborhoods."[32]

    b.     HUD has historically set payment standards too low to permit voucher holders to afford units in higher-opportunity communities

---

[32] *Expanding Housing Choices For HUD-Assisted Families*, HUD User, § I (Apr. 1996), https://www.huduser.gov/portal/publications/affhsg/expand/sec1.html; *accord supra* ¶ 28 (describing how Defendants Hartford Housing, Hartford, and Imagineers were aware of the importance of mobility counseling in the 1990's).

(where rent is higher). In Greater Hartford, these payment standards have historically prevented voucher holders living in North Hartford and similar areas from affording rent in places like West Hartford.

Fortunately, this problem was partially remedied as a result of a judgment on February 22, 2018, in *Open Communities Alliance v. Carson*, 1:17-CV-02192 (D.D.C.). That judgment requires HUD to implement a "Small Area Fair Market Rent (SAFMR)" regulation that was promulgated in 2016, and under which voucher holders are given higher payment standards in higher-opportunity areas.

c.     HUD policy requires voucher holders to go through an administrative process called "porting" if they want to leave a particular housing authority's jurisdiction. This process is burdensome, time-consuming, and imposes barriers on voucher holders who would otherwise like to leave the lower-opportunity areas in which they live. HUD's onerous system is one reason that voucher holders under the jurisdiction of one housing authority (i) often cannot access information about what their voucher would be worth in other areas, and (ii) cannot move or agree to lease terms with a landlord in those areas without first "porting."

d.     Defendants Hartford Housing, Hartford, and Imagineers have contributed to the system HUD created and further concentrated voucher holders in segregated areas. For example, Hartford Housing—which receives funding based on the number of vouchers it administers—has aggressively lobbied to obtain and keep voucher holders in its jurisdiction, even though that policy makes it more difficult for voucher holders to move outside of Hartford city limits, where there are a greater number of high opportunity areas. As another example, Hartford and Imagineers do not make their payment standards publicly available, making it more difficult for voucher holders in other jurisdictions to "port" to them.

## The Deplorable Conditions at The CARA, Barbour Gardens, and Infill Buildings

73.     In 2018 and 2019, the Individual Plaintiffs all lived in racially segregated areas with high poverty rates in North Hartford, as reflected in the following table:

| Building | Units | Plaintiffs | White % (Census Tract) | Poverty % (Census Tract) |
|----------|-------|-----------|------------------------|--------------------------|
| **CARA** | 150 | Cyvonne Cook, Trinity Claudio, Yulissa Espinal, Mirna Medina, and Milagros Ortiz | 2.1% | 49% |
| **Barbour Gardens** | 84 | Tammy Davis, Marina Ilarraza, and Maritza Rosario | 4.8% | 44.3% |
| **Infill** | 52 | Shawanda Breedlove, Stephanie Grant, Ashley Matos, and Netzabilie Torres | 1% | 44.9% |

74.     All three buildings were subsidized under HUD's PBRA program, through HAP contracts with private landlords.  As of July 2018, HUD had paid CARA's owner more than $10 million dollars to operate that property.[33]  In July 2017, HUD renewed its contract for Infill for 20 years in a deal worth over $14 million.  The owner of Barbour Gardens received payments of more than $2.25 million for 2016 to 2019 alone.

75.     Although HUD was paying the landlords of these buildings millions of dollars, all three of them were in a decrepit condition when the Individual Plaintiffs lived there.  For example:

> a.      When Hartford inspected 100 of the CARA units in February 2018, it found that nearly all of them failed the inspection.

---

[33] Matthew Ormseth, *After Years of Mismanagement And Neglect, Federal Authorities Will Terminate Notorious Landlord's Contract In Hartford*, Hartford Courant, May 31, 2018, *available at* https://www.courant.com/news/connecticut/hc-news-hartford-clay-arsenal-apartments-20180522-story.html.

b.      Black water leaked down Ms. Espinal's bathroom walls into her bathtub.  After Ms. Espinal called the fire department about it, management told her that if she ever did that again, her lease would be terminated.

c.      Gas leaks were not taken seriously: Plaintiff Milagros Ortiz lacked heat for two weeks because the gas company put a "red flag" on her apartment.

d.      Black mold and vermin permeated Barbour Gardens and caused the children there to develop asthma.[34]

e.      As U.S. Senator Chris Murphy declared upon visiting Barbour Gardens: "This is inhumane and totally unhealthy."[35]

f.      Hartford's inspectors found that Infill had a mice and roach infestation throughout its entire dwelling.

76.    All three buildings were also located in areas that were unsafe for residents.  For example:

a.      When Plaintiff Marina Ilarraza lived in Barbour Gardens, drug trafficking organizations sold drugs on the street.  Shootings were common outside the complex, and bullets sometimes hit the property itself.[36]

b.      Because of concerns about crime and instances of violence in the area, Ms. Ilarraza prevented her children from playing outside. Even in warm weather, the daycare her daughter attended did not take children outside because of the risk of shootings and other dangers.

---

[34] Tess Vrbin, *After living in hotels for months, displaced Hartford residents share their housing struggles*, Hartford Courant, Aug. 3, 2019, *available at* https://www.courant.com/community/hartford/hc-news-hartford-hud-housing-20190802-20190803-cg7jvuh3iva3xlydjmkmnzc7ii-story.html.

[35] Rebecca Lurye, *Lawmakers say HUD is complicit in 'inhumane' conditions at Hartford housing project*, Hartford Courant, Mar. 11, 2019, *available at* https://www.courant.com/community/hartford/hc-news-senators-touring-barbour-gardens-20190311-cbxcsurbyjfopiy7jugufxzjci-story.html.

[36] Rebecca Lurye, *Hartford families spend weeks in hotels after HUD closes two North End apartment buildings*, Hartford Courant, July 25, 2019, https://www.courant.com/community/hartford/hc-news-hartford-barbour-gardens-20190725-w35vukylgjgyflrtv4cor2bwxu-story.html.

c.    While living at Infill, Plaintiff Netzabilie Torres witnessed multiple shootings, including the shooting of a child in the Infill parking lot.  Her son was also mugged at a nearby bus stop, causing him serious head trauma that resulted in a debilitating mental illness.

**The Families Fought to Cancel the Buildings' HAP Contracts and Sought to Relocate**

77.    From the fall of 2017 through 2019, CLJ helped organize the CARA, Barbour Gardens, and Infill families to improve the living conditions in those buildings.  For example, with the assistance of CLJ, Ms. Espinal went door-to-door to speak with other CARA tenants about the living conditions, collected photos of those conditions, and helped organize those tenants to attend press conferences.

78.    At the beginning of 2018, the activism of the CARA residents began to pay off.  For example, in May 2018, Mayor Bronin sent Mr. Ku a letter suggesting that, if Mr. Ku did not repair CARA, he "should relinquish [his] ownership of these properties and leave the City of Hartford."

79.    HUD thereafter terminated its contracts with these buildings.  It terminated the HAP contract with CARA in May 2018, and it terminated the contracts with Barbour Gardens and Infill in February 2019.  In the termination letter regarding CARA, HUD noted that Mr. Ku continues to be in default of his obligation to maintain the project in decent, safe and sanitary conditions and that major health and safety problems continue to plague the project.

80.    The CARA, Barbour Gardens, and Infill families hoped that HUD's decision to terminate the HAP contract with these landlords would be a turning point in their lives, enabling them to move out of their low-opportunity neighborhoods.  For example:

a.    Plaintiff Netzabilie Torres hoped that the termination of the Infill contract would allow her to move to Windsor, which she thought would be peaceful and without the risk of shootings.  That environment would give her son (who had been mugged near Infill), a secure environment in which to heal.

b.　Plaintiff Ashley Matos hoped to move out of North Hartford and was very pleased when she learned that the Infill contract had been terminated. At the time, she told NBC that she was "extra excited" to move.[37]

c.　Plaintiff Marina Ilarraza was looking forward to "anything but Hartford" and hoped to provide a healthier and safer environment for her three children.

d.　Plaintiff Yulissa Espinal believed that the relocation would be her "salvation" and hoped to find a place in Newington, or Rocky Hill, or West Hartford.

81.　In connection with all three relocations, CLJ conducted surveys asking the families where they would like to move. In response, many residents expressed a desire to leave North Hartford. For example, less than one week after HUD notified Infill residents that the Infill contract was being terminated, CLJ conducted a Relocation Survey of 33 Infill residents (out of 52 units). More than three quarters of the residents polled said that they wished to move outside of North Hartford. Those residents also indicated that they would need help finding apartments, filling out applications, and obtaining transportation to see potential apartments, among other needs.

82.　Following the termination of CARA, former HUD Secretary Benjamin S. Carson visited Hartford in his official capacity to meet with the residents.[38] During that meeting, Ms. Espinal showed Secretary Carson a video taken in her CARA apartment of a cockroach trying to

---

[37] Laura Strickler, Hannah Rappleye & Suzy Khimm, *HUD says it will relocate Hartford tenants from apartments featured in NBC News investigation*, NBC News, Feb. 1, 2019, https://www.nbcnews.com/politics/white-house/hud-says-it-will-relocate-hartford-tenants-apartments-featured-nbc-n965961

[38] Jenna Carlesso *HUD Secretary Upholds Pledge To Assist Beleaguered Tenants*, Hartford Courant, June 4, 2018, https://www.courant.com/community/hartford/hc-hartford-ben-carson-hud-tenants-20180604-story.html.

get inside her baby daughter's bottle. Secretary Carson pledged that he would help Ms. Espinal and the other families with their relocation.[39]

**HUD Provided Vouchers to the Families**

83.     Following its termination of the HAP contracts of these properties, HUD provided the residents with HCV vouchers, which would allow the families to move to housing units owned by private landlords. Because Connecticut law prohibits landlords from discriminating against individuals with these vouchers,[40] the families theoretically should have been able to move to any apartment in Connecticut that was within their voucher budget and that could pass an inspection.

84.     Because of the judgment in *Open Communities Alliance v. Carson* in February 2018, HUD was required to provide the CARA residents with higher voucher payment standards in higher-opportunity areas, called "Small Area Fair Market Rent" ("SAFMR"). Indeed, data from the Census Bureau shows that in or about 2018, thousands of units were available in less racially segregated areas in Greater Hartford, at rental prices lower than the value of the SAFMR in the Hartford area. The following map illustrates this, with pink dots showing units that were available in the region, including areas that had Black and Hispanic populations lower than 20% (depicted in yellow).

---

[39] *Id.*

[40] *See* Conn. Gen. Stats. § 46a-64(a)(2) ("It shall be a discriminatory practice in violation of this section . . . to discriminate, segregate or separate on account of . . . lawful source of income.").



SAFMR units and % of Black and Hispanic in Hartford, CT Metropolitan Area

City of Hartford

Zip codes shown by HHA
(06103, 06105, 06106, 06122, 06114, 06120)

Green Space

Percent of Black and Hispanic by Zip codes
0%- 20%
21%- 40%
41%- 60%
61%- 80%
81%- 100%

SAFMR Units by Zip codes
0
1- 100
101- 500
501- 1000
1001- 4027

85.     In sum, with their newly-assigned vouchers, the CARA, Barbour Gardens, and Infill families should have been able to use their vouchers to find apartments in less racially segregated, higher-opportunity areas: those apartments were available; the payment standards made them affordable to the families; and the landlords of those buildings were prohibited from discriminating against voucher recipients.

86.     Instead of enabling the families to take advantage of this opportunity, HUD's relocation efforts effectively led them right back into heavily segregated, low-opportunity neighborhoods.

### Hartford Housing and Hartford Became Voucher Administrators

87.     For the CARA and Infill families, HUD asked Defendant Hartford Housing to serve as their HCV voucher administrator, failing to consider whether a regional voucher administrator with the best payment standards would have been a better choice.  Hartford Housing, in turn, submitted a funding request for this position, agreed to accept this responsibility, became voucher administrator for the CARA and Infill families, and received funding from HUD to carry out that responsibility.  This constrained the ability of the CARA and Infill families to move to less segregated, higher-opportunity areas.

88.     Hartford Housing only has jurisdiction within the City of Hartford.  This meant that before any of the CARA or Infill families could move outside city limits, they would need to undertake the burdensome and complex process of "porting" to another housing authority.  For example, if a voucher holder family wished to move to West Hartford, they would need to port to a housing authority with jurisdiction over West Hartford (such as the West Hartford Housing Authority).  Although Hartford Housing had the authority to assist the CARA and Infill families to (i) move to relatively higher opportunity areas within Hartford city limits and (ii) "port" to other housing authorities, the "porting" process created an unnecessary barrier that made it more difficult for those families to move to less segregated areas.  And Hartford Housing's failures to provide adequate information about "porting" further compounded that problem.

89.     Defendants have been aware of barriers created by the "porting" process  in the Hartford area since 1990.  For example, a report from HUD to Congress in April 1995 recognized that in 1990, Imagineers had created a "regional administrative plan" that "reduce[d]

portability barriers" and did not place "restrictions on where recipients can move."[41]  HUD approved that plan in 1990.[42]

90.     HUD could have, instead, requested a regional voucher administrator like the Connecticut Department of Housing ("DOH") or Hartford, each of which is permitted to approve and supervise moves outside of city limits *without* porting.

91.     Following a request by the Mayor of Hartford, HUD offered that a regional voucher administrator (Hartford) serve as voucher administrator for the residents of Barbour Gardens.  Hartford submitted a funding request for this position, took on responsibility with Imagineers as voucher administrator for the Barbour Gardens families, and received funding from HUD to carry out that responsibility.  Because Hartford is a regional voucher administrator, vouchers administered by Hartford theoretically allowed Barbour Gardens residents to move to housing units outside of the City of Hartford without porting.

92.     Although HUD's decision to request a regional administrator for the Barbour Gardens families was an improvement compared to the CARA and Infill relocations, its decision to ask Hartford to serve as voucher administrator, in particular, prevented the families from finding housing in higher-opportunity areas.  This is because in 2019, Hartford and Imagineers had worse payment standards in higher-opportunity areas than another regional voucher administrator—DOH.  As a result, the Barbour Gardens families were priced out of certain options in higher-opportunity areas that they could have afforded had HUD appointed DOH. Because HUD could have easily appointed DOH as the voucher administrator for the Barbour

---

[41] Promoting Housing Choice in HUD's Rental Assistance Programs: A Report to Congress, Apr. 1995, at 45.

[42] *See* William Hathaway, Rental aid to be widened: City will allow recipients to move to suburbs, Hartford Courant, June 21, 1990.

Gardens families, its failure to do so unnecessarily deprived the families of access to housing in those areas.

93.     Under the FHA and HUD's regulations, the acceptance of responsibility by Hartford Housing and Hartford as voucher administrators, and the contractual assignment of Hartford's responsibilities to Imagineers, conferred on all three of these entities a legal duty to counteract racial segregation and ensure that the relocated families had a meaningful chance to move to less segregated, higher-opportunity areas.  *See, e.g.*, *Otero*, 484 F.2d at 1133 (housing authorities have duty to affirmatively further fair housing); 24 C.F.R. § 982.54(a) (requiring a public housing authority, or "PHA," to "adopt a written administrative plan that establishes local policies for administration of the program in accordance with HUD requirements"); *id.* § 982.301(a)(3) (requiring PHA to provide oral briefing to families about how the voucher program works, including "explain[ing] the advantages of areas that do not have a high concentration of low-income families"); *id.* § 982.301(b) (requiring PHAs to provide information packet to assist with relocation, including resources for providing units that "cover[] areas outside of poverty or minority concentration"); *id.* § 982.353(e) (requiring PHAs to provide voucher holders with "[f]reedom of choice," meaning they "may not directly or indirectly reduce the family's opportunity to select among available units").

**Defendants Provided Inadequate Relocation Assistance to the Families**

94.     In all three relocations, HUD, as was its general practice, requested that Leumas provide the families with relocation assistance.  HUD has worked with Leumas for years and first entered into a contract with it in 2016.  Under that contract, HUD and Leumas entered into separate—but materially identical—work orders to relocate the families at CARA, Barbour Gardens, and Infill.

95.     After HUD hired Leumas, Defendants held meetings with the families to explain their relocation benefits.  The CARA and Infill families met with HUD, Hartford Housing, and Leumas.  The Barbour Gardens families met with HUD, Imagineers, and Leumas.  The purpose of those meetings was to inform the families about the HCV program and the relocation process. At the meetings, each of the CARA and Infill families was assigned a caseworker from Hartford Housing who could help with the relocation, and each of the Barbour Gardens families was assigned a caseworker from Imagineers.

96.     As these meetings illustrated, all of the Defendants were responsible for relocating the families:  HUD was responsible for the families because it had terminated the HAP contracts for the buildings, funded the HCV vouchers, and had Leumas assist with the relocation.  Hartford Housing was responsible because it was the voucher administrator for the CARA and Infill families and assigned case workers to those families to assist with their relocation.  Hartford and Imagineers were responsible because they were the voucher administrator for the Barbour Gardens families and assigned case workers to those families to assist with their relocation.

97.     Although thousands of housing units were available to the families in less racially segregated, higher-opportunity areas, Defendants' policies in designing and implementing the relocation plan prevented the families from moving to those areas.  Most of the families moved to areas that were racially segregated and had high concentrations of poverty.  Indeed, many stayed in North Hartford, in the same neighborhoods as CARA, Barbour Gardens, and Infill.

98.     Defendants limited the families' ability to move to less racially segregated, higher-opportunity areas through three different policies regarding the relocations:

    a.     *First*, Defendants decided to create a relocation plan that did not include mobility counseling services—which are designed to help

people move to less segregated, higher-opportunity areas—despite being well-aware that such services were "critically important" to combating racial segregation

b.     *Second*, Defendants created relocation plans with initial deadlines that were too short and granted *ad hoc* extensions that were not predictable or reliable enough to allow the families to find housing in less segregated, higher-opportunity areas.

c.     *Third*, HUD and Hartford Housing restricted the families' ability to move within the Greater Hartford area, including because HUD appointed a non-regional voucher administrator (Hartford Housing) and a voucher administrator without the best payment standards (Hartford/Imagineers), and because Hartford Housing did not provide information about the porting process and about regional payment standards.

## 1. Defendants Provided Discriminatory Relocation Services that Did Not Include Mobility Counseling

99.    In connection with all three relocations, non-profit CLJ and Open Communities Alliance ("OCA")—which is also undersigned counsel in this case—sent letters to each Defendant, requesting that they provide Plaintiffs with mobility counseling services that were designed and proven to help families move to higher-opportunity areas.[43]  In connection with the Barbour Gardens and Infill relocations, Senators Blumenthal and Murphy separately requested that HUD provide those services, as did the residents themselves.  In response to these requests, no Defendant denied its authority or ability to provide these services.  Indeed, on certain occasions in the past, Hartford Housing, Hartford, and Imagineers have all provided mobility counseling services to voucher holders.  Each Defendant had the ability and authority to provide these services to the families who relocated from CARA, Barbour Gardens, and Infill.

---

[43] Ex. 5, Letter from E. Boggs to J. Crisafulli (HUD), dated June 14, 2018; Ex. 6, Letters from CLJ to J. Crisafulli (HUD) and A. Sanderson (Hartford Housing), dated Oct. 12, 2018; Ex. 7, Letter from E. Boggs to HUD, dated Feb. 22, 2019; Ex. 8, Letter from E. Boggs to L. Bronin (Hartford) and K. Schultz (Imagineers), dated Mar. 11, 2019.

100.    At its core, mobility counseling services include (i) recruiting owners of rental properties in higher-opportunity areas, educating them about the HCV program, and building relationships with them, (ii) using that recruitment to create lists of rental properties in higher-opportunity areas that are provided to voucher holders, (iii) providing information about higher-opportunity areas, including tours of those areas, maps showing those areas, and brochures about the benefits of those areas (such as proximity to high-quality schools and neighborhood safety), (iv) teaching voucher holders effective strategies for communicating with landlords about the HCV program to give families confidence to call landlords and to counteract misconceptions about the program, (v) introducing tenants to specific landlords in higher-opportunity areas and accompanying or transporting families to see specific units, (vi) providing credit reports to tenants and suggesting ways in which families can correct credit issues and speak with landlords about them, (vii) providing supplemental assistance for moving expenses, including application fees and security deposits, sufficient to allow voucher holders to move to higher-opportunity areas, (viii) ensuring that vouchers are portable and that there is flexibility on payment standards, (ix) providing post-move assistance to help families stay in higher-opportunity areas, and (x) having a dedicated staff provide these services and customize the program in response to the needs of the relocating families (collectively, "Core Mobility Counseling Services").

101.    CLJ's and OCA's multiple requests for Core Mobility Counseling Services were supported by research—including HUD-sponsored research—and past experiences showing that these services help voucher families move to higher-opportunity areas:

    a.    In 1992, Congress directed HUD to conduct a study to gather information on any barriers that "might impede the geographic dispersion of families [receiving section 8 assistance]" and existing mobility programs "that help minority families receiving section 8 certificates and vouchers move out of areas with high

concentrations of minority persons living in poverty to areas with low concentrations."[44]

b.    In a 1995 report to Congress, HUD found that one of the reasons voucher holders "live in relatively segregated and economically distressed neighborhoods," is because of a lack of "adequate housing search assistance."[45]

c.    In April 1996, HUD provided a report to Congress noting that relocation assistance and counseling are "critically important" for helping families with vouchers "move to low poverty or non-minority neighborhoods."[46]

d.    In that same month in 1996, HUD agreed to a partial consent decree that included mobility counseling services in a groundbreaking housing case in Baltimore, *Thompson v. HUD*.[47] As a result of that decree, 2,000 housing vouchers were given to plaintiff class members, along with mobility counseling.[48]

e.    In September 1996, HUD published a report titled "Learning from Each Other: New Ideas for Managing the Section 8 Certificate and Voucher Programs," which described the benefits of a mobility counseling program operated at that time by Hartford and Imagineers in coordination with the Housing Education Resource Center.[49]  That same report also describes a "larger and more comprehensive" program run by the State of Massachusetts.[50]

f.    In 1998, Hartford Housing agreed to a settlement agreement in which it would operate a three-year long mobility counseling

---

[44] Housing and Community Development Act of 1992, Pub. L. No. 102-550, § 153, 106 Stat. 3717, 3717.

[45] *Promoting Housing Choice in HUD's Rental Assistance Programs*, HUD User (Apr. 1995), https://www.huduser.gov/portal/publications/povsoc/rap.html.

[46] *Expanding Housing Choices For HUD-Assisted Families*, HUD User, § I (Apr. 1996), https://www.huduser.gov/portal/publications/affhsg/expand/sec1.html.

[47] *Thompson v. HUD*, Case No. 1:95-cv-309-MJG, Dkt. No. 1245-4 (D. Md.).

[48] Stefanie DeLuca & Peter Rosenblatt, *Increasing Access to High Performing Schools in an Assisted Housing Voucher Program*, Sociology: Faculty Publications and Other Works, 2011, at 37.

[49] Finkel et al., "Learning from Each Other: New Ideas for Managing the Section 8 Certificate and Voucher Programs," at 27–28, *available at* https://www.huduser.gov/portal/Publications/pdf/learning.pdf

[50] *Id.* at 28.

program to settle claims that it had provided in adequate relocation assistance in connection with a relocation from subsidized buildings.[51]

g.     In 2000, HUD recognized that one method it had to "undo t[he] legacy" of discriminatory housing systems was to settle civil rights lawsuits with agreements to provide mobility counseling.[52]

h.     In 2009, an initial report on the *Thompson* mobility counseling program was promising, and concluded that it had allowed a majority of families to move "to low-poverty, racially integrated suburban and city neighborhoods."[53]  The report noted the importance of the program's provision of (i) outreach to landlords to counter negative stereotypes of voucher-holders, (ii) credit counseling and copies of credit reports, (iii) financial literacy trainings, (iv) advice on picking the right neighborhood, (v) using charter buses to tour suburban communities, and (vi) post-move counseling to help families adjust.[54]

i.     In 2011, a preliminary study of the *Thompson* mobility program found that 1,830 of the 2,000 families who participated in the program—91.5%—were able to successfully relocate between 2002 and 2010.[55]  On average, these participants moved from areas that were less than 20% white (with a 30% poverty threshold) to areas that were over 65% white (with a 12% poverty threshold).[56]

j.     In August 2012, the *Thompson* parties—including HUD—jointly submitted a motion for preliminary approval of class settlement that would fund up to 2,600 additional vouchers and provide "high-quality counseling to help [voucher holders] find housing

[51] *See Pitt v. Hartford Housing Authority*, 97-cv-2019 (JBA), *available at* https://www.clearinghouse.net/chDocs/public/PH-CT-0003-0001.pdf.

[52] *Baseline Assessment of Public Housing Desegregation Cases: Cross-site Report*, HUD User (Nov. 14, 2020, 5:35 p.m.),  https://www.huduser.gov/portal/publications/pubasst/baseline.html.

[53] Lora Engdahl, *New Homes, New Neighborhoods, New Schools: A Progress Report on the Baltimore Housing Mobility Program*, PRRAC (Oct. 2009), https://files.eric.ed.gov/fulltext/ED535457.pdf.

[54] *Id*.

[55] Stefanie DeLuca & Peter Rosenblatt, *Increasing Access to High Performing Schools in an Assisted Housing Voucher Program*, Sociology: Faculty Publications and Other Works, 2011, at 37.

[56] *Id*.

options, prepare them for their move, and provide ongoing support after they have moved."[57]

k.   In November 2012, one of the authors of the 2011 study of the *Thompson* mobility program submitted her research findings to the *Thompson* court.[58] Her declaration noted it was "critical" that participants be provided extensive mobility counseling and that longer search times be used to avoid "panicked decisions."[59] HUD agreed that the mobility counseling program "would enable Class Members to move to Communities of Opportunity in the Baltimore Region."[60]

l.   In 2013, a longitudinal study of impoverished families in Mobile, Alabama, further supported the importance of providing lists of eligible and available units in less racially segregated areas with lower poverty rates.[61]

m.   In 2016, HUD entered into a Preliminary Voluntary Compliance Agreement, in which it agreed to provide mobility counseling services in East Chicago.

n.   In March 2020, initial results from a randomized control trial study in Seattle and King County, Washington suggested that mobility counseling services helped 53% of families move to high-upward-mobility areas, compared with 15% in the control group.[62]

o.   In January 2020, Mayor Bronin acknowledged the importance of "adopt[ing] a more robust mobility counseling process."[63]

---

[57] *See Thompson*, Dkt. No. 877.

[58] *See Thompson v. HUD*, Dkt. No. 1245-4 ¶ 11 (D. Md. Nov. 16, 2012) (Declaration of Dr. Stefanie DeLuca in Support of Settlement Agreement).

[59] *Thompson* Dkt. No. 1245-4.

[60] *Thompson* Dkt. No. 1246.

[61] Stefanie DeLuca, Philip M.E. Garboden & Peter Rosenblatt, *Segregating Shelter: How Housing Policies Shape the Residential Locations of Low-Income Minority Families*, 647 ANNALS 268 (2013).

[62] Bergman et al., Creating Moves to Opportunity: Experimental Evidence on Barriers to Neighborhood Choice, NBER Working Paper No. 26164 (March 2020), https://opportunityinsights.org/wp-content/uploads/2019/08/cmto_paper.pdf.

[63] Ex. 9, Letter from L. Bronin and others to HUD, dated Jan. 10, 2020.

102.     Therefore, Defendants were well-aware that Core Mobility Counseling Services are critical to overcoming the barriers that voucher recipients face in seeking to move to more racially integrated neighborhoods.  These services reduce landlord discrimination by informing landlords about source of income discrimination laws, counteracting stereotypes, and otherwise encouraging landlords to be open to accepting vouchers.  The services also ensure that landlords understand the benefits of the HCV program, including that HUD guarantees the voucher payment and therefore tenants with low credit scores or negative marks on their credit history do not pose a significant risk of default.  And after developing relationships with identified landlords, mobility counselors can then make introductions between voucher holders and ally landlords, as well as provide lists and maps showing where these landlords are located.  By providing these and other services, mobility counselors can enable voucher holders to move to less segregated, higher-opportunity areas that would otherwise not be accessible to them.

103.     Despite decades of research and the many requests by CLJ, OCA, and others, Defendants refused to provide the CARA, Barbour Gardens, or Infill families with Core Mobility Counseling Services.  Nor did Defendants provide any explanation for their refusal to do so. [64] For example, in response to a letter from OCA, HUD stated only that as it moves "forward with the relocation process," it would "be certain to include discussion regarding the concerns/suggestions that have been raised in the attached letter from Open Communities Alliance."[65]  No further details were provided.  Defendants' failures, however, were consistent with their recent policy and practice of not providing mobility counseling services in connection with relocations.

---

[64] *See supra* n. 43.

[65] Ex. 10, Email from A. Escalante to OCA, dated Mar. 7, 2019.

104.     Defendants also failed to direct Leumas to provide Core Mobility Counseling Services or to otherwise ensure that the Plaintiffs were offered those services.  HUD's agreements with Leumas say nothing about counteracting segregation or providing those services.  That is true of the general contract HUD entered into with Leumas and the specific work orders for the CARA, Barbour Gardens, and Infill relocations.  Among other things, none of these documents contemplate that Leumas will reach out to landlords in less racially segregated areas to recruit and educate them about the HCV program and counteract stereotypes.

105.     Consequently, Leumas did not proactively seek out and recruit landlords in higher-opportunity areas like Avon, Farmington, or Glastonbury.  Nor did it develop relationships with landlords in those areas or create lists of ally landlords in those neighborhoods.  Instead, at Defendants' initial meetings, the families were provided lists of units predominantly located in racially segregated areas within the Hartford city limits.  Representatives of Defendants Hartford Housing, Imagineers, and Hartford (through its contracted agent, Imagineers) attended those meetings, provided listings to Plaintiffs, and were aware of the services provided by Leumas.

106.     As the relocation process progressed—and as it became increasingly clear that Defendants were not providing Core Mobility Counseling Services—OCA and CLJ reiterated their requests that Defendants provide those services and informed them that the relocation services were deficient.[66]

107.     These repeated requests continued to have no effect, with Defendants not even attempting to explain their refusal to provide Core Mobility Counseling Services.  For example, in response to a letter from CLJ regarding the CARA relocation, HUD and Hartford Housing

---

[66] Ex. 6, Letters from CLJ to J. Crisafulli and A. Sanderson, dated Oct. 12, 2018.

summarily addressed some issues raised in that letter, but completely ignored the request that HUD provide mobility counseling.[67]  The same was true of HUD's response to a similar letter sent regarding the Barbour Gardens and Infill relocations.[68]

108.    As a result, the Individual Plaintiffs faced the very barriers to moving into a less segregated neighborhood that the Core Mobility Counseling Services are designed to overcome. For example:

a.    Ms. Espinal had difficulty finding landlords that were willing to accept her voucher.  Leumas was willing to call prospective landlords with Ms. Espinal, but landlords would often tell them that they "do not accept Section 8."  Leumas did not inform landlords that this was an illegal practice under Connecticut law or otherwise encourage them to accept vouchers.  Other landlords seemingly used credit scores or other pretextual reasons to deny voucher recipients.  Ms. Breedlove, who had a credit score of 720, was rejected by landlords in higher-opportunity areas who chose other applicants "because of her credit score."  Despite these repeated issues with landlord acceptance, Leumas did not proactively seek out landlords to build relationships that would avoid such discrimination.

b.    Rather than helping Ms. Torres move to Windsor, Leumas left her on her own to deal with language barriers. The landlords she encountered refused to accept vouchers, told her that the units were already rented, or said that they needed more time to complete renovations.

c.    Ms. Matos did not have accurate information on the payment standards for her voucher.  Ms. Matos told the Leumas representative with whom she worked that she wanted to move out of Hartford, but she was worried that her low credit score would make such a move difficult.  Leumas did not provide her with the credit counseling services necessary to address that problem.  Nor did they educate landlords about how credit scores are less important for HCV holders, whose voucher amount is backed by the federal government.

---

[67] Ex. 11, Letter from J. Morales to C. Mackey, dated Oct. 19, 2018.

[68] Ex. 12, Letter from J. Morales to P. Haberlandt, dated July 31, 2019.

d.     Ms. Ilarraza and Ms. Davis repeatedly requested to review housing options in higher opportunities areas in Greater Hartford, but their Leumas relocation specialist continued to show them apartments in low opportunity areas of Hartford or other areas in which they never expressed interest.

e.     In or around July or August 2018, Ms. Ortiz informed Hartford Housing that she wished to move to West Hartford. When Ms. Ortiz asked Hartford Housing how much her voucher would cover for rent in West Hartford, the Hartford Housing representative stated that they "don't have that information." Hartford Housing instead provided her with a map containing voucher information for six zip codes, all of which were within the City of Hartford. Leumas similarly provided payment standards for only those six zip codes. For example, Leumas did not provide Ms. Cook with information about the value of her voucher outside of six zip codes in Hartford or with information about how to port her voucher.

f.     Although Ms. Grant made it clear to her Leumas caseworker that she wanted to move out of Hartford, she was not advised what she would need to do before she could move. She was not informed that she would have to find a new housing authority to administer her voucher, how to port her voucher, or the value of her voucher outside of Hartford.

g.     Ms. Breedlove repeatedly sought assistance from Leumas in finding apartments. Instead of helping to find apartments in West Hartford as Ms. Breedlove requested, a Leumas relocation specialist instead directed her to a realtor who offered to show apartments only if Ms. Breedlove paid money. The relocation specialist also provided listings at the South End of Hartford, despite Ms. Breedlove's requests otherwise.

109.    Rather than providing services that would have helped counteract these problems, Defendants approved of the discriminatory relocation plan executed by Leumas and stood by as Leumas directed tenants to other buildings in racially segregated North Hartford instead of units in less segregated areas. For example, Leumas advised tenants to sign leases with the property management company Rego Realty Corp., which operates buildings up the street from Barbour Gardens. Specifically:

a.      On or about July 12, 2019, Leumas set up a "meet & greet" with Rego Realty for the purpose of encouraging the Barbour Gardens residents to move there.

b.      Leumas suggested that Plaintiff Maritza Rosario should take whatever unit Rego Realty showed her, even though she told her Leumas representative that she wanted to move out of Hartford, to somewhere like Bloomfield or West Hartford.

c.      Rego Realty picked up and showed tenants apartments, largely in the North End.  A representative from Rego Realty drove Ms. Rosario to see three apartments, all in racially segregated Hartford neighborhoods:  two in the North End and one in the South End. With no other options and not wanting to move back to the North End, she ultimately moved to the one apartment in the South End of Hartford that Rego showed her.

110.    In light of the research showing the value of Core Mobility Counseling Services (including HUD-sponsored research), each Defendant's past experience implementing mobility counseling services in the Greater Hartford area, each Defendant's understanding of the racially segregated housing patterns of voucher holders (including in Connecticut) when mobility counseling is not provided, and the families' requests for such services to each Defendant, Defendants knew or should have known that providing those services was crucial to counteracting segregation and empowering the families to move to less racially segregated areas. But instead of considering the effects that their actions would have on patterns of segregation in Greater Hartford, Defendants ignored that research and those many requests, and adhered to their current policy of relocating families without providing these crucial services.  As a result, the affected families predictably moved to racially segregated areas.

111.    Indeed, in the letter Mayor Bronin (and others) sent after the relocation was over, he conceded that the relocation caused "the majority of tenants [to] remain[] in Hartford," and he

attributed this in part to the failure "to adopt a more robust mobility counseling process."[69] Mayor Bronin further recognized that "[t]enants can face a number of barriers to relocating to an apartment of their choice including discrimination" and stated that "the housing agency charged with assisting tenants should take an active role in helping address any barriers that the tenant encounters."[70]  Unfortunately, HUD and the "housing agenc[ies] charged with assisting tenants" in this case—Hartford, Imagineers, and Hartford Housing—did *not* provide the Core Mobility Counseling Services necessary to overcome those barriers.

112.    In response to the repeated requests from CLJ, OCA, U.S. Senators, and residents, Defendants also failed to provide any justification—much less a compelling justification—for their stubborn refusal to provide Core Mobility Counseling Services.

113.    Because of Defendants' failure to provide Core Mobility Counseling Services, CLJ belatedly attempted to redress that failing, including by accompanying certain residents to meetings with Leumas and housing authorities, helping drive people to higher-opportunity areas, and arranging for legal services lawyers to assist with landlord discrimination.  *See supra* ¶ 37. But CLJ's efforts were no replacement for the Core Mobility Counseling Services that the families needed and that Defendants were obligated to provide.

### 2. Defendants Gave the Families Insufficient Time to Relocate

114.    In all three relocations, Defendants compounded their failure to provide Core Mobility Counseling Services by giving the families insufficient time to relocate. HUD and Hartford Housing had the ability and authority to set the deadlines for the relocation of the

---

[69] Ex. 9 , Letter from L. Bronin and others to HUD, dated Jan. 10, 2020, at 5-6.
[70] *Id.*

CARA and Infill families.  HUD, Hartford, and Imagineers had the ability and authority to set the deadlines for the relocation of the Barbour Gardens families.

A. HUD and Hartford Housing Gave the CARA Families Insufficient Time to Relocate

115.    HUD and Hartford Housing gave the CARA families 90 days to relocate.  But at the meetings on July 26 and 27, 2018, they failed to make it clear when the 90-day period would start.  Nor did they provide any subsequent written notice to the CARA families clarifying the deadline when their vouchers would expire.[71]

116.    This resulted in uncertainty and put pressure on the families, given that failure to comply with that deadline would jeopardize both their relocation benefits and vouchers.  For example, CARA resident Trinity Claudio felt rushed from the start.  Ms. Claudio hoped that a voucher would give her a chance to move to a single-family home, ideally in Florida or Georgia.  But despite HUD's and Hartford Housing's assurances that the HCV enabled her to move anywhere in the country, Ms. Claudio's freedom of choice was constrained by time pressure, including calls from Leumas telling her that, if she did not find a unit quickly enough her, funds would run out.

117.    By September, Ms. Claudio had given up on leaving Connecticut and decided to apply for a unit in New Britain.  To obtain that apartment, she had to port her voucher from Hartford Housing to the West Hartford Housing Authority, a process that took about a week.  But after she ported, the opportunity she had found in that area fell through.  For that reason, she had to port back to Hartford Housing, taking another week of her time.  She continued to search throughout September and October, but was unable to find a suitable apartment.  With an

---

[71] Ex. 11, Letter from J. Morales to C. Mackey, dated Oct. 19, 2018.

impending October 24 deadline to relocate—or else lose her voucher—Ms. Claudio had no choice but to move into a unit less than two miles from CARA.

118.    Ms. Cook similarly wanted to use her voucher to leave Hartford, but learned that she would have to meet with the Hartford Housing Authority and then transfer her voucher in order to learn the value of her voucher in other areas.  With her voucher deadline approaching and no certainty that the apartments she saw would still be available, she felt she did not have time to complete these tasks, and she instead rushed to find an apartment in the South End of Hartford.

119.    Ms. Medina also wanted to leave Hartford—to find "safety, tranquility, and less crime" found in higher opportunity areas of Greater Hartford—but because of the pending relocation deadline, she was forced to find a unit within a low opportunity area inside Hartford city limits.  She drove around Hartford constantly and looked at apartments "to find something that [she] could move to quicker."  Although she would have preferred to live in a unit on the first floor, given a medical condition affecting her ability to climb stairs, she expanded her search to include all types of apartments.

120.    To try to counteract this time pressure, CLJ sent letters to HUD and Hartford Housing requesting more time.  On October 12, 2018, CLJ requested that HUD and Hartford Housing extend the CARA families' relocation benefits and services deadline to January 22, 2019.[72]  Among other reasons for requesting the extension, the letter noted that it had been difficult for the tenants to find housing in higher opportunity areas of Greater Hartford because the families (i) were not provided with payment standards for areas outside of Hartford city

---

[72] Ex. 6, Letters from CLJ to J. Crisafulli and A. Sanderson, dated Oct. 12, 2018.

limits, (ii) received information only about available housing in low opportunity areas of Hartford, and (iii) were not provided mobility counseling services.[73]

121. Rather than addressing these points, HUD and Hartford Housing provided stop-gap extensions that did little to alleviate the pressure faced by the CARA families:

      a. HUD and Hartford Housing's October 19, 2018, response to CLJ's letter did little to address CLJ's concerns.[74] Although HUD and Hartford Housing extended the relocation deadline, they did so by only 14 days—to November 9, 2018—and only because they agreed that Leumas had failed to provide written notice of the initial deadline.[75] Throughout the letter, they insisted that they on their need to adhere to each Defendant's "policy" with respect to deadlines.[76]

      b. On October 23, 2018, Leumas sent a letter to the CARA families informing them of the impending November 9 deadline. That letter, however, confusingly informed the families that, by November 5, 2018, they had to either submit a Request for Tenancy Approval form to Hartford Housing or provide proof of a new place of residence. This created uncertainty among the CARA families about whether their relocation assistance would expire on November 5.

      c. On October 30, 2018, in a phone conversation with HUD, Hartford Housing, and Leumas, CLJ and counsel for Plaintiffs again requested a longer extension for the relocation. On the call, HUD again agreed only to a short-term extension of the deadlines for vouchers and relocation assistance—an additional twenty-one days, until November 30, 2018.

      d. On November 2, 2018, Leumas sent a letter to the CARA families informing them that their relocation assistance would now expire on November 30, 2018. This letter also falsely asserted that the CARA residents were making "minimal efforts" to relocate.

---

[73] *Id.* at 4.

[74] Ex. 11, Letter from J. Morales to C. Mackey, dated Oct. 19, 2018.

[75] *Id.* at 2.

[76] *Id.*

122. These extensions did little to assure the families that they had time to find housing in higher opportunity areas. As a result of the pressure and uncertainty caused by these extensions, many of the families decided to stay in Hartford or move to other racially segregated, low-opportunity areas where they could secure housing.

123. On November 14, 2018, Plaintiffs' counsel again requested that HUD provide a longer-term extension of the vouchers and relocation assistance. On November 28, 2018, after a two-week delay in responding—and only two days before the vouchers and relocation assistance were set to expire—HUD finally granted another short-term extension until January 18, 2019.[77]

124. But by this point in time, the damage had already been done. As HUD's November 28 letter states, 89% of families—142 of the 159 tenants—had already relocated. As detailed below, the vast majority of those tenants stayed in Hartford or moved to other racially segregated, lower-opportunity areas.

B. The Barbour Gardens and Infill Families Were Also Given Insufficient Time to Relocate

125. The residents of Barbour Gardens and Infill were given an initial deadline of 120 days to move. That deadline did not provide the families with sufficient time to locate housing outside in higher opportunity areas of Greater Hartford, because the families were not given listings of apartments in those areas and were preoccupied with deteriorating conditions in their buildings.

126. For example, for twenty-five of the families who had been living in Barbour Gardens—including Ms. Davis and Ms. Ilarraza's and Ms. Rosario's families—time constraints

---

[77] Ex. 13, Letter from J. Morales to J. Regan, dated Nov. 28, 2018.

intensified after a sewage backup in Buildings 3 and 4 forced them to evacuate.[78]  In the same

basements where the sewage leaked, a flea infestation had broken out from cats that had been

living there.  The cats had entered the basement through windows that had never been fixed, and,

with the flooding, many of those cats were now rotting in the basement.

127.    The buildings were ultimately evacuated, but the resulting situation was chaotic.

Some residents were moved to the Best Western hotel in another part of town, with no

transportation plan for adults to get to work or for children to get to school.  One elderly resident

on oxygen had a panic attack—and was hospitalized—because she was not sure whether her

oxygen tank could be transported.  She passed away soon after.  Without proper support from

Defendants, CLJ assisted the families, such as catering food and negotiating with the hotel staff

on their behalf.

128.    As a result of the pressure the deadlines placed on the families and the

circumstances of the property, many of the Barbour Gardens and Infill families were forced to

stay in low opportunity areas rather than risk losing their voucher or relocation benefits:

    a.    Ms. Rosario did not know that she could seek a voucher extension
and does not remember being told by Defendants that an extension
was possible.  To the contrary, her understanding from Leumas
was that she had to find an apartment for her and her children as
soon as possible or she would lose her Section 8 voucher.  Like
others, she felt rushed, was worried about losing her voucher, and
ultimately moved to an apartment in an area of Hartford in which
she did not want to live.

    b.    The pressure made Ms. Torres stressed and depressed.  When she
became tired of looking in areas where she wanted to live—such as
Windsor—Ms. Torres canvassed the streets of the South End of
Hartford looking for "for rent" signs where she concluded she

---

[78] Rebecca Lurye, *Sewage backup forces emergency relocations from troubled Hartford apartment complex*, Hartford Courant, June 5, 2019, https://www.courant.com/breaking-news/hc-br-hartford-emergency-relocation-barbour-gardens-20190606-mtc3ccipojcqlj7wjtp2ievbbe-story.html.

would be more likely to find housing quickly. She ended up moving to an apartment there.

c. Ms. Breedlove attended viewings and applied to multiple apartments prior to the deadline, but her applications did not get accepted. She would have continued to search for an apartment outside of Hartford because she "needed to get out of the situation," but she ultimately moved to an apartment mere blocks away from Infill. According to Ms. Breedlove, "everything was against us because of the deadline."

129. On July 23, 2019, OCA sent Defendants a letter requesting a 180-day extension.[79] The letter recounts the many barriers that the families faced, including "landlord practices that are discriminatory," "lack of meaningful assistance finding suitable apartments in desired locations," and providing "incomplete or confusing guidance concerning" the worth of the families' vouchers.

130. On July 25, 2019, HUD extended the deadline for the Barbour Gardens and Infill families for 60 days, from August 19, 2019, to September 30, 2019.

131. This extension was not sufficient and provided no assurance that another extension would be given. For example, Ms. Matos believed she would become "helpless and homeless" if she failed to sign a lease before September 30 and frantically sought a place in low opportunity areas of Hartford to ensure that she did not miss the deadline. The pressure was so intense that she hastily searched for apartments even though she had just given birth to her third child and was recovering from the C-section procedure and an ensuing infection to her wound. She ultimately settled for a unit in the Sherman Charter Oaks neighborhood of Hartford. As a result, she continues to worry about the violence in her neighborhood and is dealing with a

---

[79] Ex. 14, Letter from P. Haberlandt to J. Morales and J. Crisafulli, dated July 23, 2019.

property management that has refused to fix conditions in her apartment, including a leaking fridge.

*     *     *

132.    By failing to provide adequate time to the families, Defendants failed to consider the effects of their actions on perpetuating segregation in the Greater Hartford area.  They also failed to provide any justification for refusing to provide longer extensions that would have assured the families that they had the time they needed to find housing in higher opportunity areas.  As a result, Defendants' actions perpetuated segregation.

133.    Indeed, in the letter Mayor Bronin (and others) sent after the relocation was over, he acknowledged that the relocation caused "the majority of tenants [to] remain[] in [low opportunity areas of] Hartford" and flagged that one area "where the relocation process could— and must—be improved" was that the "timetable was overly ambitious."  He conceded it was improper for there to be "an arbitrary date" for when the relocations had to be completed, and that the program should have "consider[ed] setting intermediate deadlines for tenants to start looking for apartment options."[80]

### 3. HUD and Hartford Housing Failed to Ensure that the CARA, Barbour Gardens, and Infill Families Could Move Freely Within the Greater Hartford Area

A.  <u>HUD Failed to Appoint a Regional Voucher Administrator with the Best Payment Standards</u>

134.    With respect to all three relocations, HUD failed to appoint a regional voucher administrator with the best payments standards.  This created further obstacles for the families to find housing in higher-opportunity areas.

---

[80] Ex. 9, Letter from L. Bronin and others to HUD, dated Jan. 10, 2020, at 5.

135.     *First*, with respect to the CARA and Infill families, because HUD requested that Hartford Housing take responsibility for their vouchers—even though Hartford Housing did not have authority to approve moves to higher opportunity areas of Greater Hartford outside Hartford City limits—the CARA and Infill families did not receive official information about the value of their vouchers outside Hartford city limits and generally received lists of apartments that were located within those limits.  Without ready access to that information, the families were impeded in their searches for housing in higher-opportunity areas in Greater Hartford.  *See, e.g.*, *supra* ¶ 108.

136.     *Second*, before any CARA or Infill family could move to an area outside Hartford city limits, the family was required to port from Hartford Housing to another voucher administrator.  Porting is a complicated process that requires the voucher holder to submit an application and work through a 17-step process created by HUD.  *See* 24 C.F.R. § 982.355(c)(1) to (17).  One step of that process requires the family to be "informed of the receiving PHA's procedures for incoming portable families and comply with these procedures."  *Id.* § (c)(8).  In other words, 1 of the 17 steps required to port is to comply with separate steps that differ depending on the housing authority's particular rules.

137.     Because this complicated process would effectively limit the relocated families' ability to move to more integrated, higher-opportunity areas, CLJ and OCA requested that HUD assign a regional voucher administrator for the CARA and Infill families prior to Hartford Housing becoming the voucher administrator for those families.[81]

---

[81] *See* Ex. 5, Letter from E. Boggs to J. Crisafulli, dated June 14, 2018; Ex. 6, Letters from CLJ to J. Crisafulli and A. Sanderson, dated Oct. 12, 2018; Ex. 7, Letter from E. Boggs to HUD, dated Feb. 22, 2019.

138.     But HUD proceeded to ask Hartford Housing to take responsibility for the relocations, without considering the effect this would have on segregated housing patterns or providing any justification for why it had not instead pursued a regional administrator.[82] In doing so, HUD foreseeably perpetuated segregation by impeding the families from moving to less racially segregated, higher-opportunity areas.  Indeed, in later criticizing the relocation for causing "the majority of tenants [to] remain[] in Hartford," Mayor Bronin explained that one area "where the relocation process could—and must—be improved" was to "ensure that the housing agency selected to administer the Section 8 vouchers for the relocating tenants have a large geographic jurisdiction to ensure that tenants have the broadest relocation opportunities."[83]

139.     *Third*, although HUD appointed a regional administrator for the Barbour Gardens families, it failed to request the administrator with the best payment standards.  In particular, HUD could have requested appointment of DOH, which in 2019 had better payment standards in higher-opportunity areas than Hartford and Imagineers.  For example, whereas the Imagineers payment standard for a 1-bedroom unit in Glastonbury in 2019 was $1,110, DOH's payment standard for that same type of unit in Glastonbury was $1,221, or 10% higher.

140.     HUD's arbitrary decision to appoint Hartford and Imagineers rather than DOH unnecessarily constrained the families from moving to higher-opportunity areas, deprived them of options in those areas by pricing them out of apartments there, and compounded the problems the families faced because of the Defendants' failure to provide mobility counseling or adequate time.

---

[82] Ex. 11, Letter from J. Morales to C. Mackey, dated Oct. 19, 2018.

[83] Ex. 9, Letter from L. Bronin and others to HUD, dated Jan. 10, 2020, at 5.

B. Hartford Housing Made it Difficult CARA and Infill Families to Move to Higher Opportunity Areas

141.     Even though Hartford Housing only has jurisdiction within the City of Hartford, it had the ability and the authority to assist the CARA and Infill families move to relatively higher opportunity areas within Hartford city limits.  And Hartford Housing also could have assisted families with "porting" to other housing authorities as explained above, by providing counseling about "porting" and information about the voucher payment standards for housing authorities servicing those same areas. Indeed, Hartford Housing's Executive Director recognized at the beginning of the CARA relocation that the CARA families would be able to immediately "port" out of Hartford if they chose, notwithstanding a one-year residency requirement that is sometimes imposed on new voucher holders.[84]  But Hartford Housing chose to do neither.

\*     \*     \*

142.     The decision by HUD to appoint Hartford Housing as voucher administrator and the decisions by Hartford Housing not to provide counseling about "porting" or sufficient information about payment standards compounded the problems that the CARA and Infill families faced during the relocation processes.  For example:

a.  Ms. Matos found a unit in Windsor Locks that would have met her family's needs and about which she was very excited.  But after she spent considerable time and effort on the cumbersome task of porting her voucher to the Windsor Locks authority, she was told that the rent for the unit was outside her voucher budget, leaving her with insufficient time to secure another unit in a higher opportunity area.  This problem would have been avoided if Hartford Housing had provided Ms. Matos with adequate guidance on payment standards at the beginning of the process.

b.  Ms. Espinal went to the West Hartford Housing Authority and attempted to port there so that she could find a unit in a higher-opportunity neighborhood in West Hartford.  She was told, however, that her "Hartford" voucher did not allow her to port there unless she already had a

---

[84] Ex. 15, Email from Annette Sanderson to Jennifer R. Gottlieb Elazhari, dated June 15, 2018.

unit in mind. Although West Hartford Housing Authority has a list of available landlords and units, it stated that it could not give the list to her because she had not yet ported.

c. In September or October 2018, Ms. Claudio was able to find a unit in New Britain. Ms. Claudio ported to the West Hartford Housing Authority so that it could inspect and approve her move to the New Britain unit. Ultimately, however, that unit fell through, requiring her to port back to Hartford Housing. That process took two weeks, during which Ms. Claudio was unable to search for other apartments. And when it was over, Ms. Claudio felt even more pressured to find a unit quickly.

d. Ms. Grant was not provided accurate information concerning the value of her voucher outside of Hartford. She was only given the HUD small area fair market rent figures, which can be as much as 10% higher than the actual value of a voucher as determined by the housing authority's payment standards. Instead of receiving payment standards used by housing authorities serving zip codes outside of the City of Hartford, Ms. Grant was directed to use the general list of the value of the SAFMR in the Hartford areas in searching for units. As a result, Ms. Grant searched for apartments without an accurate understanding of what she could afford in the neighborhoods outside of Hartford where she wanted to move.

## Defendants' Failures Caused the Families to Relocate to Racially Segregated, Lower-Opportunity Areas

143. Because of Defendants' flawed relocation program, the families were hindered from moving to less racially segregated, higher-opportunity areas. Prior to the relocation, the Individual Plaintiffs hoped to leave North Hartford and move to a higher opportunity area. But instead, those individuals all moved to census tracts that had a disproportionately low white population and a disproportionately high poverty concentration. *See supra* ¶¶ 39-50.

144. For example, Ms. Ilarraza ended up in a census tract that is 7.0% white and has a poverty concentration of 50.2%. Her new tract not only has a higher poverty concentration than the Barbour Gardens tract (44.3%), but it also is similarly ranked as among the 95% worst in America on HUD's employment, labor participation, and educational attainment index and was among the 71% worst on its environmental health hazard index. The units in Ms. Ilarraza's new building have the same set of abhorrent conditions affecting the health and safety of their

families that Barbour Gardens did. In fact, Ms. Ilarraza considers it "worse than Barbour Gardens" with people "doing drugs right outside of [her] building." She and her children have trouble sleeping at night due to rats rustling around the walls.

145. Similarly, Ms. Matos ended up in a census tract that is 12.4% white and has a poverty concentration of 38.4%. Ms. Matos's new tract is ranked as among the 95% worst in America on HUD's employment, labor participation, and educational attainment index and as among the 78% worst on its environmental health hazard index. Ms. Matos is also once again dealing with uninhabitable conditions in her new apartment—such as a non-functioning stove, pests, and criminal activity in and around her building—just as she was when she lived in Infill.

146. Ms. Ilarraza, Ms. Matos, and the other Individual Plaintiffs are not outliers. The data show that Defendants' relocation program resulted in the vast majority of the CARA, Barbour Gardens, and Infill families—who are predominantly Black and/or Hispanic—moving to areas that have disproportionately low white populations and disproportionately high poverty concentrations. At the time of filing, census tract data are available for 173 of the 202 CARA and Infill households and for all 84 of the Barbour Gardens households.

147. The data show that although Greater Hartford is 67.8% white, the families moved to census tracts that are on average 17.0% white. And although the average poverty concentration in Greater Hartford is 10.1%, the families moved to census tracts that have an average poverty concentration of 31.0%.

148. Notably, the Barbour Gardens families—who received a regional voucher administrator, but not one with the best payment standards—moved to census tracts that were less racially segregated (20.8% white, on average) and had a lower poverty concentration (29.2%, on average) than the CARA and Infill families. Although the Barbour Gardens families

moved to less racially segregated areas than the CARA and Infill families, the vast majority of families from all three buildings—including Barbour Gardens—moved to areas with a high degree of racial segregation and high poverty concentration.  Indeed, 95.8% of the families moved to areas with white populations lower than the average in Greater Hartford, and 86.9% of families moved to areas with poverty concentrations higher than average for Greater Hartford as well.  This outcome is in stark contrast to other relocations that have included mobility counseling—e.g. where a majority of participating families moved to less segregated, higher opportunity areas.  *See supra* ¶ 101.  Had the Defendants provided an adequate relocation program to the CARA, Barbour Gardens, and Infill families, that same kind of outcome was attainable here.

149.     The map below shows that almost all of the families (depicted with blue dots) moved to areas with disproportionately low white populations (depicted in purple). Barely any of the families moved to areas that are more than 60% white (depicted in yellow).



150. The map below is a blowup of Hartford city limits, where the vast majority of families moved. This map shows the large numbers of tenants—76.9% of all of the relocated families—who moved to census tracts that were less than 25% white. And it shows that many families stayed in North Hartford, in tracts that are less than 2% white.



151.    The map below illustrates how the families moved to areas in Greater Hartford with disproportionately high poverty concentrations.  Notably, almost all of the families moved to areas with poverty concentrations greater than 10.1% (depicted in blue).



## Defendants' Failures Reflect a Broader Practice That is Likely to Recur

152.    The relocations from CARA, Infill and Barbour Gardens are not isolated incidents.  Similar relocations have happened before,[85] and they are likely to happen again.  For one, HUD appears to be entrenched in its practice of hiring contractors like Leumas that do not provide Core Mobility Counseling Services.  Despite HUD's knowledge going back decades that

---

[85] *See, e.g.*, Mary O'Leary, *Housing vouchers remain an issue as New Haven families leave Church Street South*, New Haven Register, Sept. 14, 2015; Don Stacom, *Blaze Displaces 52 Tenants*, Hartford Courant, May 15, 2019, at B3.

these services are crucial to counteracting segregation, HUD hired Leumas in 2016 under a contract that does not provide for Core Mobility Counseling Services. And here, despite Leumas's failure to provide relocation services to the CARA families that counteracted segregation—and despite objections by and scrutiny from Connecticut's two U.S. Senators— HUD still insisted on hiring Leumas to provide relocation services for Barbour Gardens and Infill. The other Defendants, similarly, have a policy of not providing mobility counseling in connection with relocations. There is little doubt, then, that Defendants will continue their policies of not providing mobility counseling services in connection with relocations, which will further perpetuate segregation.

153. This type of case is also likely to recur because PBRA buildings in Connecticut are in poor conditions. Research suggests that property inspection scores for PBRA properties are decreasing as mold grows, infestations worsen, and buildings fall deeper into disrepair.[86] As these scores continue to fall, HUD will likely be forced to cancel other PBRA contracts in the future. Indeed, according to data available on HUD's website, eleven PBRA buildings in Connecticut, including three in Hartford, received failing inspection scores in the past two years, thereby increasing the likelihood that the HAP contracts will be terminated and residents will be forced to relocate.

154. For these reasons, if HUD's failure to provide proper assistance is unaddressed now, HUD will likely maintain its recent policy of hiring relocation service providers designed to relocate people quickly—even if that means relocating predominantly Black and Hispanic

---

[86] *See* Molly Parker, *How HUD's Inspection System Fails Low-Income Tenants Nationwide*, The Southern Illinoisan, Nov. 16, 2018.

voucher holders to predominantly Black and Hispanic areas with high poverty concentrations in violation of its duties under the FHA.

**HUD Re-Subsidized CARA and Barbour Gardens**

155.     HUD further perpetuated segregation in Greater Hartford by resubsidizing CARA and agreeing to resubsidize 48 of the 84 units in Barbour Gardens.

156.     Under Section 8(bb) of the United States Housing Act, 42 U.S.C. § 1437f(bb), if a PBRA HAP contract is terminated, HUD is authorized to transfer any remaining budget authority to either a new or an existing PBRA HAP contract to provide assistance to eligible families.

157.     With respect to CARA, in or about summer 2018, funds were released to HUD as a result of HUD terminating its HAP contract with Mr. Ku.

158.     In or before October 23, 2019, HUD entered into a HAP contract with the new owner of CARA, Triumph Housing Management, LLC ("Triumph Housing").

159.     On information and belief, in making this decision, HUD did not consider the effects that its decision to resubsidize CARA would have on patterns of segregation in Hartford.

160.     On October 23, 2019, Triumph Housing sent a letter inviting the CARA families to return to CARA.

161.     New residents have moved in to CARA, and those residents are predominantly Black and/or Hispanic.

162.     With respect to Barbour Gardens, based on information received from HUD as well as the current owner of Barbour Gardens, HUD has agreed to resubsidize 48 of the 84 units in Barbour Gardens through the PBRA program.

163.     More specifically, following the termination of HUD's HAP contract with Infill in February 2019, the budget authority for Infill was released to HUD.

164. Rather than using that subsidy to provide housing in a less racially segregated, higher-opportunity area, HUD now intends to use that subsidy to enter into a HAP contract with the new owner of Barbour Gardens, Heritage Housing, Inc. ("Heritage Housing").

165. Indeed, Heritage Housing relied on this expectation when it purchased Barbour Gardens in October 2019. And in early 2021, Heritage Housing is expected to begin renovations on Barbour Gardens, and intends to invest over $115,000 per unit.

166. Based on the demographics in the area, it is likely that future residents of Barbour Gardens will be predominantly Black and Hispanic.

167. For this reason, HUD's decisions to resubsidize CARA and partially resubsidize Barbour Gardens perpetuated segregation in Greater Hartford by further concentrating Black and Hispanic residents in North Hartford.

168. HUD's decision to resubsidize these buildings is part of a longstanding practice of placing PBRA-subsidized buildings in segregated, lower-opportunity areas in Greater Hartford. *See supra* ¶ 69.

169. HUD's policy and practice of placing PBRA-subsidized buildings in these areas area rather than in less racially segregated, higher-opportunity areas, has harmed Greater Hartford in at least two ways:

170. *First*, HUD's practice has harmed North Hartford by perpetuating patterns of segregation and poverty there. This policy has had neighborhood effects that harm the Individual Plaintiffs who continue to live in Hartford.

171. *Second*, HUD's practice of placing PBRA-subsidized buildings in segregated, low-opportunity, areas has deprived the Individual Plaintiffs of opportunities to live in higher-opportunity areas in which HUD could choose to fund subsidized housing.

172.    In resubsidizing these buildings, HUD did not consider these effects and did not provide any justification for its actions.

## CLASS ACTION ALLEGATIONS

173.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of the following proposed Classes:

a.    **Relocation Class**: All persons (i) whose families received vouchers and were relocated after HUD terminated its HAP contract with CARA, Barbour Gardens, and/or Infill, (ii) are Black and/or Hispanic, and (iii) were relocated to an area that has a higher than average concentration of Black and/or Hispanic residents.

  i.    CARA Relocation Subclass: All members of the Relocation Class who were relocated as a result of HUD terminating its HAP contract for CARA.

  ii.    Barbour Gardens Relocation Subclass: All members of the Relocation Class who were relocated as a result of HUD terminating its HAP contract for Barbour Gardens.

  iii.    Infill Relocation Subclass: All members of the Relocation Class who were relocated as a result of HUD terminating its HAP contract for Infill.

b.    **Resubsidization Class**: All Black and/or Hispanic persons living in Greater Hartford who are eligible for subsidized housing under any HUD-funded program, including but not limited to the PBRA, the HCV program, and/or Public Housing programs.

174.    The Classes can be readily ascertained through records maintained by HUD.  In particular, on information and belief, HUD maintains and can readily procure records identifying (i) all individuals who lived in the CARA, Barbour Gardens, and Infill buildings prior to their HAP contracts being terminated; (ii) the relocation services that it provided to those individuals after the properties' HAP contracts were terminated; (iii) the areas in which those individuals were relocated; (iv) all individuals who have received subsidized housing from HUD in Greater

Hartford; and (v) the race of all of these individuals. That information will be sufficient to ascertain and locate all members of each Class and Subclass.

175. The Classes meet the requirement of Federal Rule of Civil Procedure 23(a)(1) because they are comprised of over 250 persons, and therefore are so numerous that joinder of all members is impracticable.

176. The Classes meet the requirements of Federal Rule of Civil Procedure 23(a)(2) because questions of law and fact are common to the class:

    a.    The following are examples of questions of fact and law common to the Relocation Class and Subclasses (collectively, the "Relocation Classes"):

        i.    Whether 42 U.S.C. § 3608(e)(5) imposes on HUD an affirmative legal duty to counteract segregation in Greater Hartford;

        ii.    Whether Defendants decided not to provide Core Mobility Counseling Services to the Relocation Classes during the relocation;

        iii.    Whether Defendants' decision not to provide Core Mobility Counseling Services to the Relocation Classes perpetuated segregation in Greater Hartford;

        iv.    Whether HUD appointed Hartford Housing to administer the vouchers provided to the CARA and Infill Class Members;

        v.    Whether HUD's appointment of Hartford Housing to administer the vouchers provided to the CARA and Infill Class Members perpetuated segregation in Greater Hartford;

        vi.    Whether HUD's appointment of Hartford (and Imagineers, by assignment) to administer the vouchers provided to the Barbour Gardens Class Members perpetuated segregation in Greater Hartford;

        vii.    Whether Defendants decided to provide insufficient relocation time to the CARA, Barbour Gardens, and Infill Subclasses;

viii. Whether Defendants' decision to provide insufficient relocation time to the CARA, Barbour Gardens, and Infill Subclasses perpetuated segregation in Greater Hartford;

ix. Whether Hartford Housing decided not to provide information about and assistance with voucher porting and payment standards to the CARA and Infill Subclasses;

x. Whether Hartford Housing's decision not to provide information about and assistance with voucher porting and payment standards to the CARA and Infill subclasses perpetuated segregation;

xi. Whether HUD's decision not to provide Core Mobility Counseling Services during the relocation of the Relocation Classes, decision not to provide sufficient relocation time to the CARA, Barbour Gardens, and Infill Subclasses, and decision not to assign a voucher administrator with the best payment standards constituted a breach of HUD's affirmative duty under 42 U.S.C. § 3608(e)(5);

xii. Whether Defendants' decisions not to provide Core Mobility Counseling Services, sufficient time during the relocation, or information about or assistance with voucher porting and payment standards was a violation of 42 U.S.C. §§ 3604(a) & (b).

b. The following are examples of questions of fact and law common to the Resubsidization Class:

i. Whether HUD and Hartford's resubsidization of the CARA and Barbour Gardens properties perpetuated segregation in Greater Hartford;

ii. Whether funds were made available to HUD when it terminated its HAP contracts with CARA and Barbour Gardens;

iii. Whether HUD could have used those funds in a manner that promoted integration in Greater Hartford;

iv. Whether 42 U.S.C. § 3608(e)(5) imposed on HUD an affirmative legal duty to use those funds to counteract segregation in Greater Hartford;

v.  Whether HUD's resubsidization of PBRA buildings in North Hartford constituted a breach of HUD's affirmative duty under 42 U.S.C. § 3608(e)(5); and

vi.  Whether Hartford's participation in HUD's resubsidization of PBRA buildings in North Hartford was a violation of 42 U.S.C. §§ 3604(a) & (b).

177.  The Classes meet the requirements of Federal Rule of Civil Procedure 23(a)(3)

because the claims of the Plaintiffs are typical of the claims of each class:

a.  **Relocation Class.**  The claims of the Individual Plaintiffs are typical of the claims of the Hartford Relocation Class.  Those Plaintiffs all (i) were relocated after HUD terminated its HAP contract with CARA, Barbour Gardens, and/or Infill, (ii) are Black and/or Hispanic, and (iii) were relocated to an area that has a higher than average concentration of Black and/or Hispanic people.

i.  CARA Relocation Subclass:  The claims of Cyvonne Cook, Trinity Claudio, Yulissa Espinal, Mirna Medina, and Milagros Ortiz are typical of the claims of the CARA Relocation Subclass because they (a) share the qualities of the Relocation Class, and (b) formerly lived in CARA prior to its HAP contract being terminated.  They are also typical of the CARA Subclass because Hartford Housing was their voucher administrator.

ii.  Barbour Gardens Relocation Subclass:  The claims of Marina Ilarraza, Tammy Davis, and Maritza Rosario are typical of the claims of the Barbour Gardens Relocation Subclass because they (a) share the qualities of the Relocation Class, and (b) formerly lived in Barbour Gardens prior to its HAP contract being terminated.  They are also typical of the Barbour Gardens class because Hartford (and Imagineers, by assignment) was their voucher administrator.

iii.  Infill Relocation Subclass:  The claims of Shawanda Breedlove, Ashley Matos, Stephanie Grant, and Netzabilie Torres are typical of the claims of the Infill Relocation Subclass because they (a) share the qualities of the Relocation Class, and (b) formerly lived in Infill prior to its HAP contract being terminated.  They are also typical of the Infill Subclass because Hartford Housing was their voucher administrator.

b. **Resubsidization Class**: The claims of the Individual Plaintiffs are typical of the claims of the Hartford Resubsidization Class. Specifically, they are all Black and/or Hispanic individuals living in Greater Hartford who are eligible for subsidized housing. HUD's decision to resubsidize CARA and Barbour Gardens perpetuated segregation in the area in which they live and denied them opportunities to live in higher-opportunity areas.

178. The Classes meet the requirements of Federal Rule of Procedure 23(a)(4) because the Plaintiffs will fairly and adequately protect the interests of the classes. Plaintiffs share common goals, background, history, and experience, and will all benefit from the fundamental goal of the relief sought in this lawsuit: Countering segregation in Hartford and providing more opportunities to persons eligible for HUD's housing subsidies.

179. The Classes meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions would create a risk of establishing incompatible standards of conduct for Defendants and/or could, as a practical matter, be dispositive of the interests of other members who are not parties to individual adjudications.

180. The Classes meet the requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and because final injunctive relief is appropriate respecting each Class as a whole. Specifically:

a. **Relocation Class.** Defendants failed to provide Core Mobility Counseling Services, provide sufficient time to relocate, and/or appoint a regional voucher administrator with the best payment standards. Injunctive relief providing class members with Core Mobility Counseling Services, sufficient to time to relocate to a higher-opportunity area, and an appointed regional voucher administrator with the best payment standards will benefit all class members.

b. **Resubsidization Class.** HUD's resubsidization of CARA and Barbour Gardens perpetuated segregation in Greater Hartford, where all class members live and in which all class members are being deprived of subsidized housing opportunities in higher-opportunity areas. Injunctive relief, *inter alia*, countering that segregation will benefit all class members.

181.    The Classes meet the requirements of Federal Rule of Civil Procedure 23(b)(3)

for the reasons above and because questions of law and fact common to the class predominate

over any questions involving individual class members.

## CAUSES OF ACTION

### COUNT I – Acting Contrary to Law and/or in an Arbitrary and Capricious Manner Regarding Relocations (HUD)

**Defendant**: HUD

**Plaintiffs**: All Plaintiffs

**Classes**: Relocation Class; All Relocation Subclasses

**Authority**: 42 U.S.C. § 3608(e)(5); 5 U.S.C. § 701 *et seq.*

182.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully

set forth herein.

183.    Plaintiffs bring this Count I against HUD on behalf of all Plaintiffs, as well as on

behalf of the Relocation Class and Subclasses.

184.    The Individual Plaintiffs and Class Members lived in buildings in North Hartford

that were subsidized by HUD under HAP contracts between HUD and the landlords of those

buildings.

185.    Plaintiff CLJ assisted the families living in those buildings to organize against

their landlords, and to request that HUD cancel its HAP contracts with those buildings.

186.    As a result of those efforts, HUD canceled its HAP contracts with those buildings.

187.    When HUD canceled its HAP contracts with those buildings, it provided the

Individual Plaintiffs with subsidies in the form of vouchers and hired Leumas to relocate the

Individual Plaintiffs to other buildings owned by private landlords.

188. HUD's relocation plan perpetuated segregation: The Individual Plaintiffs and the Class Members moved to areas that were racially segregated and had disproportionately high poverty concentrations.

189. HUD's actions perpetuated segregation for three reasons that apply to all Individual Plaintiffs and Relocation Classes:

      a.    *First*, HUD failed to provide Core Mobility Counseling Services to Plaintiffs and Class Members.

      b.    *Second*, HUD failed to provide the Individual Plaintiffs with sufficient time to locate housing in higher-opportunity areas.

      c.    *Third*, HUD failed to appoint a regional voucher administrator with the best payment standards for Plaintiffs and Class Members.

190. Plaintiff CLJ attempted to mitigate HUD's failures by advocating for HUD to provide these services and additional time. When HUD continued to provide those services, CLJ provided certain of the CARA, Barbour Gardens, and Infill families with assistance in locating housing in higher-opportunity areas.

191. In refusing to (i) provide Core Mobility Counseling Services, (ii) provide sufficient time for Plaintiffs to relocate, and (iii) appoint a regional voucher administrator with the best payment standards, HUD did not consider the effects its actions would have on patterns of segregation. HUD further failed to provide any justification for its decisions, despite requests from CLJ and others.

192. HUD's actions and omissions perpetuated segregation in Greater Hartford by causing the Individual Plaintiffs, who are all Black and/or Hispanic, to move to segregated areas.

193. HUD's actions also injured CLJ by causing it to expend and divert resources in an attempt to counteract HUD's unlawful conduct.

194.     By perpetuating segregation in this manner, HUD breached its duty to

affirmatively further fair housing ("AFFH Duty").  *See* 42 U.S.C. § 3608(e)(5); *Otero*, 484 F.2d

at 1134 (HUD must take affirmative steps to promote the "goal of open, integrated residential

housing patterns" and "to prevent the increase of segregation, in ghettos, of racial groups whose

lack of opportunities the [FHA] was designed to combat").

195.     Plaintiffs continue to live in racially segregated areas and to be harmed by HUD's

actions.

196.     Plaintiffs are entitled to judicial review of HUD's decision under the

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*:

> a.      HUD's breach of its AFFH Duty caused legal wrong to Plaintiffs by depriving them of opportunities to live in higher-opportunity areas with higher concentrations of non-Hispanic white people (*see* 5 U.S.C. § 702);
>
> b.      HUD's breach of its AFFH Duty by (i) not providing Core Mobility Counseling Services, (ii) not providing sufficient time for Plaintiffs to relocate, and (iii) not appointing a regional voucher administrator with the best payment standards for Plaintiffs constituted a final agency action for which there is no other adequate remedy (*see id.* § 704);
>
> c.      This Court is empowered to compel HUD to provide Core Mobility Counseling Services and reasonable relocation time, which HUD unlawfully withheld from Plaintiffs (*see id.* § 706(1)); and
>
> d.      This Court is further empowered to hold unlawful and set aside the flawed relocation plan that HUD devised, and require HUD to devise and create an adequate relocation plan, on the grounds that HUD's plan was arbitrary, capricious, not in accordance with law, and was short of the statutory right guaranteed by the AFFH Duty (*see id.* § 706(2)(A), (C)).

**COUNT II – Fair Housing Act Regarding Relocations (Hartford Housing)**
<u>Defendants</u>**: Hartford Housing**
<u>Plaintiffs</u>**: CLJ, CARA, and Infill Plaintiffs**
<u>Classes</u>**: CARA and Infill Relocation Subclasses**
<u>Authority</u>**: 42 U.S.C. § 3604(a) & (b), § 3613**

197.     Plaintiffs repeat and reallege each and every allegation set forth in Count I as if fully set forth herein.

198.     Plaintiffs bring this Count II against Hartford Housing on behalf of the CARA and Infill Plaintiffs and Subclasses.

199.     In connection with the allegations in Counts I and II, Hartford Housing was responsible for the relocation of the Clay Arsenal and Infill Plaintiffs and Subclasses, because it agreed to serve as voucher administrator for the families relocating from Clay Arsenal and Infill. Nearly all of those families were Black and/or Hispanic.

200.     Hartford Housing, as a matter of policy, decided not to provide Plaintiffs with Core Mobility Counseling Services.

201.     Hartford Housing, as a matter of policy, decided not to provide the Clay Arsenal and Infill Plaintiffs and Class Members with appropriate time limits for using their relocation vouchers.

202.     Hartford Housing, as a matter of policy, decided not to provide the Clay Arsenal and Infill Plaintiffs and Class Members with adequate information about or assistance with voucher porting and payment standards.

203.     As a result, the Clay Arsenal and Infill Plaintiffs and Class Members moved to racially segregated areas with disproportionately high concentrations of poverty.

204. Through these actions, Hartford Housing perpetuated segregation in Greater Hartford.

205. Accordingly, Hartford Housing violated 42 U.S.C. § 3604(a) by making dwellings unavailable to Plaintiffs in higher-opportunity areas, and thereby perpetuating segregation in Greater Hartford; and violated 42 U.S.C. § 3604(b) by providing relocation services in a manner that deprived Plaintiffs of the ability to move to higher-opportunity areas, and thereby perpetuating segregation in Greater Hartford.

206. Plaintiffs continue to live in racially segregated areas and to be harmed by Hartford Housing's actions.

207. Plaintiffs are entitled to privately enforce Hartford Housing's violations of these statutory provisions through 42 U.S.C. § 3613.

208. Plaintiffs are seeking damages and injunctive relief to correct the injuries Hartford Housing caused them.

### COUNT III – Fair Housing Act Regarding Relocations (Hartford & Imagineers)

**Defendants: Hartford & Imagineers**
**Plaintiffs: CLJ and Barbour Gardens Plaintiffs**
**Classes: Barbour Gardens Subclass**
**Authority: 42 U.S.C. § 3604(a) & (b), § 3613**

209. Plaintiffs repeat and reallege each and every allegation set forth in Count I as if fully set forth herein.

210. Plaintiffs bring this Count III against Hartford and Imagineers on behalf of the Barbour Gardens Plaintiffs and Subclass.

211. Hartford and Imagineers were responsible for the relocation of the Barbour Gardens Plaintiffs and Subclasses because they agreed to serve as voucher administrators for the

families relocating from Barbour Gardens. Nearly all of those families were Black and/or Hispanic.

212.    Hartford and Imagineers decided not to provide the Barbour Gardens Plaintiffs and Class Members with Core Mobility Counseling Services.

213.    Hartford and Imagineers further decided to provide the Barbour Gardens Plaintiffs and Class Members with inadequate time for using their relocation vouchers.

214.    As a result, the Barbour Gardens Plaintiffs and Class Members moved to racially segregated areas with disproportionately high concentrations of poverty.

215.    Through these actions, Hartford and Imagineers perpetuated segregation in Greater Hartford.

216.    Accordingly, Hartford and Imagineers violated 42 U.S.C. § 3604(a) by making dwellings unavailable to Plaintiffs in higher-opportunity areas, and thereby perpetuating segregation in Greater Hartford; and violated 42 U.S.C. § 3604(b) by providing relocation services in a manner that deprived Plaintiffs of the ability to move to higher-opportunity areas, and thereby perpetuating segregation in Greater Hartford.

217.    Plaintiffs continue to live in racially segregated areas and to be harmed by Hartford and Imagineers's actions.

218.    Plaintiffs are entitled to privately enforce Hartford and Imagineers's violations of these statutory provisions through 42 U.S.C. § 3613.

219.    Plaintiffs are entitled to damages and injunctive relief to correct the injuries Hartford and Imagineers caused them.

**COUNT IV – Acting Contrary to Law and/or in an Arbitrary and Capricious Manner Regarding Resubsidization (HUD)**

**Defendant**: HUD

**Plaintiffs**: All Plaintiffs

**Class**: Resubsidization Class

**Authority**: 42 U.S.C. § 3604(a) & (b), § 3608(e)(5); 5 U.S.C. § 701 et seq.

220. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

221. Plaintiffs bring this Count IV against HUD on behalf of Plaintiffs and the Resubsidization Class.

222. Plaintiffs and Members of the Resubsidization Class all live in Greater Hartford and are eligible for subsidized housing provided by HUD, except for CLJ, which serves and assists Plaintiffs and Members of the Resubsidization Class.

223. Since 2018, HUD has terminated its HAP contracts with at least three properties in the North Hartford area—CARA, Barbour Gardens, and Infill—due to the decrepit conditions of those properties.

224. As a result of terminating those contracts, the funds previously tied to those properties were released to HUD.

225. Under Section 8(bb) of the United States Housing Act, 42 U.S.C. 1437f(bb), HUD was authorized to use those released funds to enter into further PBRA HAP contracts, including contracts with landlords in areas that are not racially segregated.

226. Rather than using these funds to enter into PBRA HAP contracts with landlords in areas that are not racially segregated, HUD decided to resubsidize buildings in North Hartford, including resubsidizing CARA and partially resubsidizing Barbour Gardens.

227. In or before October 23, 2019, HUD decided to resubsidize CARA.

228. In or about October 2019, HUD committed to use funding available to it to re-subsidize 48 of the 84 units in Barbour Gardens.

229. On information and belief, the families who are now residing in CARA and will reside in Barbour Gardens are and/or will be predominantly Black and/or Hispanic.

230. HUD's actions and omissions perpetuated segregation in Greater Hartford by concentrating Black and/or Hispanic families in North Hartford, and by denying low-income families alternative opportunities in less racially segregated areas.

231. In deciding to re-subsidize the CARA and Barbour Gardens properties, HUD did not consider the effects its actions would have on patterns of segregation. HUD further failed to provide any justification for its decisions.

232. Instead, HUD furthered its pattern and practice of placing PBRA-subsidized buildings in areas like North Hartford that have are racially segregated and have disproportionately high poverty rates.

233. By perpetuating segregation in this manner, HUD breached its AFFH Duty and its duty not to perpetuate segregation. *See* 42 U.S.C. § 3604(a) & (b), § 3608(e)(5).

234. Plaintiffs continue to live in racially segregated areas and to be harmed by HUD's actions.

235. Plaintiffs and Class Members are entitled to judicial review of HUD's decision under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Specifically:

  a. HUD's policy of placing subsidized housing in racially segregated areas and its breach of its AFFH Duty caused legal wrong to Plaintiffs and Class Members by perpetuating segregation in Greater Hartford, where they live (*see* 5 U.S.C. § 702);

  b. HUD's breach of its AFFH Duty by entering into HAP contracts with CARA and Barbour Gardens constituted a final agency action for which there is no other adequate remedy (*see id.* § 704); and

c.      By failing to use available funds to integrate Greater Hartford, HUD unlawfully withheld actions it was required to take to comply with its AFFH Duty—specifically actions that promoted integration rather than perpetuated segregation (*see id.* § 706(1));

d.      HUD's policy of placing subsidized housing in racially segregated areas and its decision to further concentrate Black and Hispanic individuals in North Hartford by resubsidizing CARA and Barbour Gardens was arbitrary, capricious, and not in accordance with law (*see id.* § 706(2)(A)); and

e.      HUD's policy of concentrating Black and Hispanic individuals in North Hartford deprives Plaintiffs of the statutory right guaranteed by the AFFH Duty (*see id.* § 706(2)(C)).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.      *First*, certifying this action as a class action under Rule 23(b) of the Federal Rules of Civil Procedure, and declaring the Individual Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

b.      *Second*, declaring, adjudging, and decreeing that by the conduct alleged herein, HUD unlawfully withheld agency action and that its conduct was arbitrary, capricious, contrary to law, and short of a statutory right;

c.      *Third*, directing each Defendant to take all necessary actions to place the Relocation Plaintiffs and Class Members in the position they would have been in had Defendants provided proper relocation assistance to them, including but not limited to taking any and all actions necessary to permit them to break their current rental obligations, provide them with Core Mobility Counseling Services, transfer authority for their vouchers to a regional administrator with the best payment standards, provide them with sufficient time to relocate, and create a fund to assist with the relocation process that can be used*, inter alia*, for breaking leases early, rental applications, credit checks, moving costs, and security deposits;

d.      *Fourth*, enjoining each Defendant from relocating Plaintiffs and Class Members in the future without (i) providing Core Mobility Counseling Services, (ii) providing sufficient time for those families to relocate, and (iii) appointing a regional voucher administrator with the best payment standards to administer the vouchers for those families.

e.      *Fifth*, enjoining HUD from subsidizing further buildings in racially segregated areas of Greater Hartford without first obtaining approval of the Plaintiffs and this Court;

f.      *Sixth*, directing HUD to counteract the segregation that it has caused in Greater Hartford by making subsidized housing units available in less racially segregated areas;

g.      *Seventh*, directing HUD to counteract the segregation it has caused in North Hartford by taking all steps necessary to reverse the effects caused by HUD's policy of placing PBRA-subsidized buildings in that area and by the HUD policies that have resulted in voucher holders being segregated in that area;

h.      *Eighth*, monetary relief to compensate Plaintiffs for, *inter alia*, lost housing, education, and economic opportunities as a result of moving to lower-opportunity areas, as well as any and all emotional distress and expenses incurred in connection with the relocation;

i.      *Ninth*, granting Plaintiffs the costs of suit, including reasonable attorneys' fees and expenses; and

j.      *Tenth*, affording Plaintiffs and Class Members with such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues triable as a matter of right.

Dated: May 14, 2021
Hartford, CT


Respectfully submitted,

By: /s/ *Sarah Mac Dougall*

Peter M. Haberlandt (# ct27036)
Erin Boggs (# ct22989)
OPEN COMMUNITIES ALLIANCE
75 Charter Oak Avenue
Suite 1-200
Hartford, CT 06106
phaberlandt@ctoca.org
eboggs@ctoca.org


J. L. Pottenger, Jr. (# ct05479)
Gregory Briker (*law student intern*)
Shana Hurley (*law student intern*)
Zoe Masters (*law student intern*)
Areeb Siddiqui (*law student intern*)
Benjamin Gerig Shelly (*law student intern*)
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
j.pottenger@ylsclinics.org


Thomas Silverstein (phv# forthcoming)
Haley Adams (*pro hac vice forthcoming*)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW Suite 900
Washington, DC 20005
(202) 662-8600
tsilverstein@lawyerscommittee.org
hadams@lawyerscommittee.org


*Counsel for Plaintiffs*

Lanny A. Breuer (# phv11026 )
Shankar Duraiswamy (# phv10818 )
Andrew Stanner (*pro hac vice* forthcoming)
Daniel Suleiman (# phv11024 )
James Yoon (# phv11028)

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5324
lbreuer@cov.com
dsuleiman@cov.com
sduraiswamy@cov.com
jyoon@cov.com

Alexander Setzepfandt (# phv11023)
Sarah Mac Dougall (#phv11022)
Shira Poliak (# phv11027)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
asetzepfandt@cov.com
smacdougall@cov.com
spoliak@cov.com